**Brock C. BAUDER, Appellant,**

v.

**ALASKA AIRLINES, INC., and Alaska Workers' Compensation Board, Appellees.**

No. S–9886.

Supreme Court of Alaska.

Aug. 2, 2002.

---

David Graham, Graham Law Firm, Sitka, for Appellant.

Mark L. Figura, Rose & Figura, Anchorage, for Appellee Alaska Airlines, Inc.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

PER CURIAM.

The judgment of the superior court affirming the underlying decisions of the Alaska Workers' Compensation Board is AFFIRMED for the reasons expressed in the attached opinion of the superior court.[1]

BRYNER, Justice, not participating.

## APPENDIX

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FIRST JUDICIAL DISTRICT AT SITKA

Case No. 1SI-99-159 CI

### DECISION ON APPEAL

Brock Bauder appeals the determinations by the Alaska Workers' Compensation Board concerning his permanent partial impairment rating, his entitlement to additional temporary total disability benefits and his compensation rate. For the reasons stated below, however, the court concludes that the Board correctly applied the law and that its determinations on these issues were supported by substantial evidence.

Mr. Bauder also argues that the workers' compensation administrator handling his case frivolously or unfairly controverted his claim. But at the time of the controversion, Mr. Bauder was not entitled to a lump sum award and therefore the controversion was not unfair or frivolous.

Finally, Mr. Bauder argues that he is entitled to penalties, interest, attorney's fees, and costs. But, again, the court determines that the Board correctly addressed these claims in its decision.

1. The opinion of the superior court has been edited to conform with the formal standards of this court.

## I. FACTS

On July 24, 1993, Brock Bauder injured his back while working for Alaska Airlines in Sitka, Alaska.[1] This workers' compensation case arises out of that injury and his employment record with Alaska Airlines before and after July 24, 1993.

In the spring of 1988, Mr. Bauder graduated from high school.[2] He fished commercially that summer and then worked for Spenard Builders Supply.[3] But Mr. Bauder had always been intrigued with aviation and flying and he thought the best way to pursue that goal was to work for Alaska Airlines.[4]

In December 1988, as Mr. Bauder tells it, he talked the manager of the Sitka Alaska Airline Station into hiring him as a casual employee to unload a plane loaded with freight.[5] After that, the manager called Mr. Bauder in to work for the airline when employees were sick or on vacation over the holiday season.[6] This casual employment lasted just a few weeks, until early January 1989.[7] Mr. Bauder went fishing again but was re-hired by Alaska Airlines on June 5, 1989 as a temporary, part-time ramp agent.[8] Before Mr. Bauder began to work for the company, he filled out an application and informed the company that he had undergone surgery on his back in 1985 after a high school basketball injury.[9]

Mr. Bauder worked as a temporary employee for Alaska Airlines that summer and in August he applied for a permanent position.[10] On September 5, 1989, he was hired as a permanent, part-time employee on the ramp.[11] He remembers working on and off between September of 1989 and June of 1990 and the records establish that he did work over the holiday season of 1989–1990 and in the spring of that year.[12]

In June of 1990, Alaska Airlines reclassified Mr. Bauder to a full-time position for the summer.[13] In the fall, because of a reduction in flights, he was given the option of returning to part-time employment or being laid off.[14] Mr. Bauder decided to go to college at the University of North Dakota to study aviation administration and to learn to fly.[15] He was laid off on September 3, 1990.[16]

After completing his first year of school, Mr. Bauder wrote to the manager of the Sitka Alaska Airlines station and asked for summer work.[17] He was hired as a temporary, part-time ramp agent on June 5, 1991 and worked that summer.[18] He also commercially fished for one or two weeks.[19] After the summer season ended, Mr. Bauder was laid off and he returned to college in the fall.[20]

In May of 1992, Mr. Bauder again resumed working for Alaska Airlines as a part-time ramp agent until being furloughed after the summer season ended.[21] Mr. Bauder re-

1. Record on Appeal at 1 (hereinafter "R.").

2. Transcript of Proceedings Before the Alaska Workers' Compensation Board, December 8, 1998 at 39 (hereinafter "Board Tr.").

3. *Id.*

4. Board Tr. 40.

5. *Id.*

6. Tr. 41; R. 101–04.

7. *Id.*

8. Tr. 41–42; R. 93.

9. Board Tr. 38, 74; R. 98–99.

10. R. 88.

11. R. 85.

12. Board Tr. 42; R. 75–83.

13. R. 74.

14. R. 73.

15. Board Tr. 44–45.

16. R. 70.

17. R. 69.

18. Board Tr. 45, 118; R. 57.

19. Board Tr. 46.

20. Board Tr. 118; R. 52, 55.

21. Board Tr. 49; R. 957–58, 118–19.

turned to the University of North Dakota for the fall semester.[22]

When Mr. Bauder came home to Sitka for the Christmas holidays in 1992, he worked for Alaska Airlines for approximately 10 days.[23] And, as was now becoming a pattern, he returned to work for the airline in the summer of 1993.[24]

Mr. Bauder injured his lower back while loading boxes of fish into the belly of an airplane on July 24, 1993.[25] He sought treatment from Dr. Donald Funk, who recommended physical therapy and released him to return to work provided the work was not strenuous.[26] Mr. Bauder did light duty work until he was again laid off after the summer season on September 7, 1993.[27]

Rather than returning to North Dakota for school that fall, Mr. Bauder went to Denver, Colorado to attend a school-sponsored internship with United Airlines.[28] In Colorado, Mr. Bauder sought treatment for his back from Dr. Jeffrey Kleiner.[29] Dr. Kleiner diagnosed the problem as "a left-sided sacroiliac joint arthropathy or sprain." [30] After several visits, Dr. Kleiner told Mr. Bauder that he might have to have surgery.[31]

Mr. Bauder's internship ended in December of 1993, and Dr. Kleiner released him to do light work on December 15, 1993.[32] On the same day, he returned to work for Alaska Airlines for the holiday season, and as was usual, after the season ended he was laid off in mid-January.[33]

Dr. Bill Boettcher is a Seattle orthopedic surgeon. He performed the 1985 surgery on Mr. Bauder's back when he was injured in high school.[34] On January 18, 1994, Mr. Bauder went to Dr. Boettcher because of recurrent problems with his back.[35] Dr. Boettcher diagnosed the problem as being spondylolisthesis, or a separation of the vertebrae in the lumbar region, and referred him to another doctor, Dr. Edwin Lauren.[36] On February 4, 1994, Dr. Laurnen performed a fusion of the separated vertebrae in Mr. Bauder's back.[37] After the operation, Mr. Bauder was ordered to rest at home.[38]

When Mr. Bauder was first injured in July of 1993, he filled out a workers' compensation injury report.[39] After the operation, Mr. Bauder was eligible for temporary total disability benefits.[40] A claim examiner calculated Mr. Bauder's temporary total disability benefit as $157.34 a week.[41] Mr. Bauder questioned the amount of his disability benefit from the beginning.[42]

Mr. Bauder was eventually released to go back to work provided the work was sedentary.[43] Then on April 28, 1994, Dr. Laurnen released Mr. Bauder to do light work.[44] Mr. Bauder was able to return to work at Alaska Airlines performing light work on March 14, 1994.[45] His workers' compensation benefits

22. Tr. 51; R. 947.

23. Board Tr. 51; R. 960, 116.

24. R. 115.

25. Board Tr. 53–54; R.1.

26. Board Tr. 55; R. 970.

27. Board Tr. 55; R. 972.

28. Board Tr. 56–57; R. 973.

29. R. 994–98.

30. R. 994–96.

31. R. 997.

32. Tr. 59; R. 968, 998.

33. Board Tr. 59.

34. R. 890, 1003–04.

35. R. 1003.

36. R. 1005–06.

37. R. 1026–27.

38. R. 1032.

39. R. 1.

40. R. 2.

41. R. 2–5.

42. Board Tr. 72–73; R. 1051.

43. R. 1033.

44. R. 1035.

45. R. 112.

stopped on March 13, 1994.[46]

On May 25, 1994, Dr. Laurnen told vocational rehabilitation counselor Denise Van Der Pol that it was not in Mr. Bauder's best interest to continue to work as a ramp service agent.[47] Dr. Laurnen recommended that Mr. Bauder find light work activities that would not put excessive stress on his back.[48] Also, about this time, Alaska Airlines did not have further light duty work available and Mr. Bauder was put on sick leave status.[49] After his sick leave and vacation benefits were used, Mr. Bauder was put on medical leave.[50] Again Mr. Bauder began receiving temporary total disability payments.[51]

In the fall of 1994, Mr. Bauder returned to North Dakota to complete his final year of college and he graduated that spring.[52] In June he became a contract pilot with Oklahoma Executive Jet Charter.[53] Mr. Bauder took this position in order to build up his flight hours.[54] He was paid $35 a day to cover expenses.[55] Mr. Bauder worked for Oklahoma Executive Jet Charter until November 17, 1995.[56] He continued to receive temporary total disability benefits during this period.[57]

On December 29, 1995, Marilyn Noel, an account executive with the workers' compensation administrator representing Alaska Airlines, filed a notice controverting Mr. Bauder's entitlement to continuing tempo-rary total disability benefits.[58] Ms. Noel claimed that temporary total disability benefits should end because Mr. Bauder was working.[59] Also, she wrote the Department of Labor and requested that a fraud investigation be started because she claimed that Mr. Bauder was working and receiving benefits at the same time.[60] His worker's compensation benefits were stopped on December 26, 1995.[61]

After leaving Oklahoma Executive Jet Charter in November, Mr. Bauder accepted an offer to become Director of Human Resources/Pilot for a start-up corporation called NOVI Global Investments (NOVI).[62] Although Mr. Bauder was promised an annual salary of $60,000, and in March was promised even more money, he was never paid anything by NOVI.[63] Because he was not paid, Mr. Bauder left NOVI in May of 1996 and filed a wage claim.[64] He eventually received a judgment in his favor and against NOVI on this claim.[65]

In September of 1996, Ms. Noel wrote to Mr. Bauder and asked him to be seen by Dr. Boettcher for a permanent impairment rating evaluation.[66] Dr. Boettcher saw Mr. Bauder on October 4, 1996 and rated him as having a 25% permanent partial impairment.[67] During the evaluation, the doctor noted that there were problems with the last operation and he referred Mr. Bauder to Dr. Laurnen for an examination and perhaps,

---

46. R. 7.

47. R. 1049.

48. *Id.*

49. R. 1010, 1051, 111.

50. R. 111.

51. R. 7.

52. R. 280, 947.

53. Board Tr. 80; R. 280.

54. Board Tr. 80.

55. Board Tr. 80–83.

56. Board Tr. 83; R. 280.

57. R. 10.

58. Board Tr. 130–31; R. 6.

59. R. 6.

60. Board Tr. 152; R. 1061, 1062.

61. R. 7.

62. Board Tr. 83–84; R. 280

63. Board Tr. 84.

64. Board Tr. 84–85, 101.

65. Board Tr. 101.

66. R. 1065.

67. R. 1066–68.

another operation.[68] Dr. Laurnen did see Mr. Bauder and performed another operation on November 7, 1996.[69] Mr. Bauder began receiving temporary total disability payments again on the 7th of November as well.[70]

In March and April of 1997, Mr. Bauder worked as a pilot for Penn Air.[71] From April 21, 1997 to May 3, 1997, Mr. Bauder was employed as a pilot for Wings of Alaska.[72] His temporary disability benefits ended on April 2, 1997.[73]

Mr. Bauder continued to see Dr. Laurnen and on June 2, 1997, Dr. Laurnen determined that Mr. Bauder was able to perform the work at Alaska Airlines with no restrictions.[74]

At the request of Ms. Noel, Mr. Bauder saw Dr. Boettcher on June 5, 1997 for another rating.[75] Dr. Boettcher again rated Mr. Bauder as being 25% permanently impaired.[76] But the doctor noted that Mr. Bauder was physically able to work as an airline pilot and that he was medically stable.[77]

On July 1, 1997, Ms. Noel filed another notice controverting Mr. Bauder's right to a lump sum payment of his permanent partial impairment disability benefits until the fraud investigation was completed.[78] In addition Ms. Noel asked Mr. Bauder to be seen by Dr. Shawn Hadley for an employer's medical examination.[79] On October 5, 1997, Dr. Hadley found Mr. Bauder to have a permanent impairment of only 10%.[80]

On August 20, 1997, Mr. Bauder, now represented by an attorney, filed an application to adjust his claim for workers' compensation benefits. An attorney representing the workers' compensation administrator filed yet another controversion of Mr. Bauder's adjusted claim on September 12, 1997 and on December 8, 1998, a hearing was held before the Workers' Compensation Board.

## II. PROCEEDINGS BEFORE THE BOARD AND THE COURT

Mr. Bauder raised five issues before the Board.[81] He argued that the administrator relied on the wrong workers' compensation provision to calculate his total temporary benefits and that the administrator improperly terminated these benefits before he was medically stable. He argued that he was entitled to benefits based on a permanent partial impairment rating of 25% rather than the 10% rating the claims adjuster was offering. And he argued that the administrator's controversion of his claims was frivolous and that he should be awarded penalties, interest and attorney fees. The administrator contested all these issues and argued that Mr. Bauder was paid total temporary disability benefits when he should not have received these payments.

After hearing testimony from Mr. Bauder, an Alaska Airlines employee who handles workers' compensation issues for the airline and from Ms. Noel, the claims adjuster, and after considering the record, the Board issued a written decision. In that decision, the Board concluded that the claims adjuster had relied on the correct statutory provision to calculate Mr. Bauder's temporary benefits, but did not decide any of the other issues.[82]

68. R. 1067.

69. R. 1070–71.

70. R. 16.

71. R. 1111.

72. *Id.*

73. R. 16.

74. R. 1098.

75. R. 1100.

76. R. 1100–01.

77. R. 1100–04.

78. R. 14.

79. Report of Dr. Shawn Hadley, Exhibit 1 attached to deposition of Dr. Shawn Hadley dated December 1, 1998 (hereinafter Hadley Report).

80. Hadley Report at 5.

81. R. 906.

82. Decision and Opinion, 98–0322, at 12, 15, December 31, 1998 (hereinafter December Decision).

The delay in resolving the other issues had to do with the Board's decision to request a second medical exam before deciding what Mr. Bauder's permanent partial impairment rating should be. The Board noted the dispute between Dr. Hadley's 10% rating and Dr. Boettcher's 25% rating. And even though there were procedural problems with Dr. Boettcher's 25% rating, the Board still placed sufficient weight on his opinion to ask for another opinion.[83]

After the Board's December decision, Mr. Bauder filed an appeal to the superior court. He also saw Dr. Douglas Smith for the Board's requested medical examination.[84] Dr. Smith rated Mr. Bauder's permanent impairment at 15%.[85]

In July of 1999, the Board issued a second written decision. The Board found that Dr. Boettcher's opinion was sufficient to raise the presumption that Mr. Bauder suffered a 25% permanent impairment rating, but that Dr. Hadley's 10% rating was substantial evidence rebutting the higher rating.[86] After considering the entire medical record, the Board concluded that Dr. Smith's rating of 15% properly took into account Mr. Bauder's prior high school injury and, based on a preponderance of the evidence, that was the appropriate rating.[87]

The Board also addressed most of the issues left unresolved in its December decision. Mr. Bauder sought temporary total benefits between March 17, 1994 through May 31, 1994 and from December 27, 1995 through November 6, 1996. But the Board concluded that Mr. Bauder was employed during these periods and therefore found that Mr. Bauder was not due temporary benefits.[88] The Board also found that the

adjuster's controversions were not frivolous or unfair. In addition, the Board dismissed Mr. Bauder's claim for penalties because it concluded that the controversion of Dr. Boettcher's impairment rating was timely and that the administrator timely paid the permanent impairment benefits due Mr. Bauder. The Board dismissed and denied Mr. Bauder's claim for interest as there was no evidence that the benefits were not timely paid. Finally, the Board awarded Mr. Bauder $3,125 in attorney's fees and $1,168.92 in costs.[89]

One issue was left unresolved by the Board. The Board did not resolve the adjuster's claim that it had overpaid temporary benefits to Mr. Bauder. The Board elected not to address this issue because the amount of temporary benefits was on appeal.[90]

Mr. Bauder appealed the Board's July decision, and eventually the appeals over the first decision and the second decision were consolidated.

### III. ISSUES ON APPEAL

Mr. Bauder raises five main arguments on appeal. First, he argues that he is entitled to benefits based on Dr. Boettcher's opinion that he was permanently impaired at a 25% level. Next, he argues that he is entitled to temporary total disability benefits during the time he worked at NOVI Global Investments from about November 1995 to May of 1996.[91]

Third, Mr. Bauder argues the Board should have determined his spendable weekly wage for temporary benefits under former workers' compensation statute AS 23.30.220(a)(2) rather than subsection (1).[92] Further, Mr. Bauder argues that as applied to him, AS 23.30.220(a)(1) is unconstitutional.

---

83. *Id.* at 15.

84. Decision and Opinion, 99–0144, at 5, July 6, 1999 (hereinafter July Decision).

85. *Id.* at 6.

86. *Id.* at 9.

87. *Id.*

88. *Id.* at 12.

89. July Decision at 12–16.

90. *Id.* at 11.

91. In his briefing, Mr. Bauder sought temporary benefits for other periods. But at oral argument, he waived these arguments.

92. This statute was amended after Mr. Bauder's injury. The amendment took effect September 4, 1995. *See* 75 SLA ch 75, sections 9, 10 (1995).

Fourth, Mr. Bauder claims that the July 1, 1997 controversion was frivolous or unfair. And finally, Mr. Bauder asserts that he is entitled to penalties, interest, attorney's fees and costs.

## IV. STANDARDS OF REVIEW

The Alaska Supreme Court recognizes four standards to be employed by courts when reviewing administrative decisions.[93] When factual issues are disputed the court must apply the "substantial evidence" standard.[94] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [95]

When legal issues are raised that involve agency expertise or fundamental policy formation, the court employs the deferential "reasonable basis" test.[96] That is, the court defers to the agency decision as long as it is reasonable and supported by the evidence.[97] For legal determinations not involving agency expertise courts use the "substitution of judgment" standard.[98] Application of this standard means that the court can substitute its judgment on a legal question that involves statutory interpretation or other legal issues where the courts have specialized knowledge and experience.[99]

In this case, all Mr. Bauder's arguments involve some question of law and some question of fact. The court employs the substitution of judgment test to issues of law raised by Mr. Bauder and the substantial evidence test to all questions of fact.

The disputes over the permanent partial impairment rating and whether Mr. Bauder should have received temporary total disability benefits from November 1995 to May 1996, raise, primarily, questions of fact.

Therefore, the court must review the Board findings on these issues to see whether they are supported by substantial evidence. But some of Mr. Bauder's arguments on these issues also raise questions of law. These issues are addressed under the substitution of judgment standard.

The issue concerning the temporary total disability benefit calculation raises, primarily, a question of law. Because this legal question centers on the application of statutes and case law, the court must reach an independent conclusion.

The issues concerning the controversion notices, penalties, interest, fees and costs raise questions of fact and law. Therefore the court employs the substantial evidence test and the substitution of judgment test.

## V. PERMANENT PARTIAL IMPAIRMENT RATING

Several doctors over the years treated Mr. Bauder's back injury. Dr. Boettcher treated Mr. Bauder's high school injury and operated on his back in 1985. Drs. Funk, Kleiner, Boettcher and Laurnen treated Mr. Bauder's 1993 work-related injury. Dr. Laurnen twice operated on Mr. Bauder's back and Dr. Boettcher twice rated Mr. Bauder as having a 25% permanent partial impairment. Dr. Hadley, the adjuster's physician, rated Mr. Bauder as having a 10% impairment and, after the first hearing, Dr. Smith saw Mr. Bauder at the Board's request and rated him as having a 15% impairment.

The Board found that Dr. Boettcher's report and ratings and Dr. Laurnen's report were sufficient to raise the presumption that Mr. Bauder had a 25% work-related impairment.[100] But the Board also found Dr. Hadley's testimony rebutted the presumption at least as far as the rate of the impairment.[101]

**93.** *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

**94.** *Peninsula Correctional Health Care v. Dep't of Corrections,* 924 P.2d 425, 426 (Alaska 1996).

**95.** *Thompson v. United Parcel Service,* 975 P.2d 684, 688 (Alaska 1999).

**96.** *Id.*

**97.** *Id.*

**98.** *Id.*

**99.** *Id.*

**100.** July Decision at 8.

**101.** *Id.* at 9.

To resolve this conflict, the Board ordered another medical examination and found Dr. Smith's 15% rating, after considering the entire medical record, persuasive.[102]

■ Alaska Statute 23.30.122 provides that the Board is the sole evaluator of the credibility and weight of witnesses, including medical testimony and reports. The Board's findings of credibility and weight are conclusive even if conflicting evidence exists.[103]

The only question for the court is whether there is substantial evidence supporting the Board's conclusion. Even though there is conflicting medical testimony, the Board acted reasonably in trying to resolve the medical disagreement. Ordering another medical examination allowed a third doctor to review the record, examine Mr. Bauder and reach an independent conclusion. Dr. Smith's report and conclusion are relevant factors that a reasonable mind might accept as adequate to support the Board's conclusion.[104]

■ Mr. Bauder argues, however, that the Board should have awarded him the 25% permanent partial impairment benefit as of October 4, 1996, when Dr. Boettcher first rated him.[105] But a rating for permanent impairment is governed by AS 23.30.190. This statute requires among other things that the injury be "partial in character but permanent in quality[.]"[106] When Dr. Boettcher evaluated Mr. Bauder on October 4, 1996, he wrote:

I do not believe [Mr. Bauder's] claim should be closed at this time. He has significant impairment, namely the chronic back pain and the neurologic deficit in his right leg which can be successfully treated by successful surgery. I believe he should be reevaluated by Dr. Laurnen and reop-

eration should strongly be considered. Due to his pain and neurologic deficit, I believe he is unable to perform any type of work at this time and this condition is permanent until successful surgery is accomplished.[107]

Based on this, Dr. Boettcher's October 4, 1996 rating was, at best, premature because Mr. Bauder's impairment was not "permanent in quality."

■ On June 5, 1997, Dr. Boettcher reevaluated Mr. Bauder and again assigned him a 25% impairment rating.[108] Mr. Bauder argues that the Board erred in failing to adopt Dr. Boettcher's second rating. The adjuster, under 8 AAC 45.052(c),[109] submitted a request to cross-examine Dr. Boettcher about this report. But Mr. Bauder never made Dr. Boettcher available for cross-examination, and the Board did not err by declining to adopt Dr. Boettcher's June 5, 1997 rating. Nonetheless, contrary to Mr. Bauder's assertion that the Board excluded Dr. Boettcher's report, the Board specifically stated that it "accept[ed] the hearsay evidence concerning Dr. Boettcher's opinion into the record for the purpose of explaining and supplementing other medical evidence in the reports of Drs. Hadley and Laurnen."[110]

Mr. Bauder also argues that the Board failed to consider and apply the statutory time limits for the controversion of permanent impairment benefits. Mr. Bauder correctly argues that although the administrator filed controversions on December 29, 1995[111] and July 1, 1997,[112] it did not controvert Mr. Bauder's impairment rating until September 12, 1997.[113] This is almost a year after Dr. Boettcher's first rating and over three months after Dr. Boettcher's second rating.

102. *Id.*

103. AS 23.30.122; *Thompson,* 975 P.2d at 688.

104. *Thompson,* 975 P.2d at 688.

105. The Board did not address this issue in either of its decisions.

106. AS 23.30.190(a).

107. R. 1067–68.

108. R. 1100–01.

109. R. 875–76.

110. July Decision at 8.

111. R. 6.

112. R. 14.

113. R. 17.

Under AS 23.30.155(d), the employer has 21 days after the date of learning of a doctor's impairment rating to pay that amount or to controvert the need to pay impairment benefits.[114] Mr. Bauder argues that because the insurer did not controvert or pay the impairment benefit within the 21 days, the Board was obligated to accept the 25% rating.

But as the insurer correctly argues, Mr. Bauder's argument is premised on a misunderstanding of the consequences of not timely filing a controversion. When an employer neither timely pays nor controverts a claim for compensation, AS 23.30.155(e) imposes a 25% penalty to be paid "at the same time as, and in addition to" the unpaid compensation. Thus, the failure to controvert compensation within 21 days does not bar the employer from later filing a controversion nor does it mean that the level of impairment is established.[115]

Instead, failure to file a controversion within 21 days results in a 25% penalty under AS 23.30.155(e) if the employer is ultimately found liable for the disputed compensation.[116] Accordingly, Mr. Bauder's argument that Alaska Airlines' failure to controvert either of Dr. Boettcher's ratings within 21 days precludes them from doing so later is without merit.

## VI. ADDITIONAL TEMPORARY TOTAL DISABILITY BENEFITS

Mr. Bauder next argues that the Board erred in not awarding him temporary total disability benefits while he was working for NOVI Global Investments. Temporary total disability benefits are governed by AS 23.30.185:

In case of disability total in character but temporary in quality, 80 percent of the injured employee's spendable weekly wages shall be paid to the employee during the continuance of the disability. Temporary total disability benefits may not be paid for any period of disability occurring after the date of medical stability.[117]

Alaska Statute 23.30.395(1) defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of his injury in the same or any other employment." AS 23.30.395(21) defines "medical stability" as

the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or deterioration resulting from the passage of time; medical stability shall be presumed in the absence of objectively measurable improvement for a period of 45 days; this presumption may be rebutted by clear and convincing evidence[.]

The presumption of compensability in AS 23.30.120(a) applies when an employer controverts continuing entitlement to temporary benefits.[118] To overcome this presumption, the employer must introduce "substan-

---

**114.** *Sumner v. Eagle Nest Hotel,* 894 P.2d 628, 631 (Alaska 1995).

**115.** In support of his argument, Mr. Bauder cites *Hammer v. City of Fairbanks,* 953 P.2d 500 (Alaska 1998), and *Bockness v. Brown Jug, Inc.,* 980 P.2d 462 (Alaska 1999). But Mr. Bauder's reliance on these cases is misplaced. In *Hammer,* the court imposed the statutory penalty on the employer for failing to timely pay or file a controversion. *Hammer,* 953 P.2d at 507. *Hammer* did not even suggest that a potential remedy for a late-filed controversion was issue preclusion. In *Bockness,* the issue of an untimely controversion was not discussed. Neither case stands for the proposition that if an employer does not controvert benefits within 21 days, it is forever barred from doing so. Further, 8 AAC 45.182, which governs controversions, does not provide that controversions must be made within a certain time period or thereafter waived.

**116.** Because the Board agreed with Dr. Smith and found that Mr. Bauder sustained a 15% impairment and the additional award was promptly paid, no penalty is appropriate under AS 23.30.155(e).

**117.** The Board accepted Dr. Boettcher's opinion that Mr. Bauder reached medical stability as of June 5, 1997. AWCB decision, July 6, 1999 at 11.

**118.** *Olson v. AIC/Martin J.V.,* 818 P.2d 669, 672 (Alaska 1991).

tial evidence" to the contrary.[119] From late November 1995 until May of 1996, Mr. Bauder worked as the Director of Human Resources/Pilot for NOVI Global Investments.[120] He was supposed to be paid a yearly salary of $60,000 and in March was given a raise to $90,000. But NOVI never paid him.[121]

In denying Mr. Bauder's claim for temporary benefits during this period, the Board found:

> Although the employee may not have received his pay from NOVI, the record is clear he worked for pay, and was entitled to pay. We find the employee's argument he is due [temporary total disability] benefits because NOVI violated its contract to pay him is disingenuous. We find the employee's resulting earning loss, and his resignation from that position, were not related to his work injury and not compensable. *Vetter v. AWCB*, 524 P.2d 264, 266 (Alaska 1974).[122]

But Mr. Bauder argues that the Board erred in not awarding him temporary benefits during the time he was employed by NOVI because he was never actually paid a salary.

In *Bailey*, the Supreme Court held that returning to work "is sufficient evidence to rebut the presumption of continuing compensability for temporary total disability."[123] Because Mr. Bauder returned to work, the presumption of compensability is overcome. But in *Olson*, the Alaska Supreme Court noted that it has "never indicated that obtaining 'any' work terminates an employee's right to [temporary total disability] benefits."[124] Mr. Bauder relies on this case.

In *Olson*, the Board denied the employee temporary benefits during the time he was capable of working as a tire shop manager.[125] The Board emphasized that the employee had joined his father's retreading shop as an organizer/supervisor.[126] But the Supreme Court reversed. The court ordered the Board to "consider Olson's earning potential and the availability of employment."[127] The court emphasized that Mr. Olson was not paid for his work in his father's shop.[128] Further, the court distinguished *Bailey* by noting that the employee in *Bailey* was earning more after his injury than he did prior to being injured.[129]

Mr. Bauder's situation is distinguishable from that in *Olson*. First, Mr. Bauder was eligible for, and fully expected to be paid by NOVI. Moreover, his agreed-upon salary far exceeded what he had been earning at Alaska Airlines at the time of his injury. In fact, when he received the December 29, 1995 controversion notice for temporary benefits, Mr. Bauder testified that he did not contest it because he was expecting to be paid and did not need the benefits.[130] Furthermore, Mr. Bauder filed a wage claim against NOVI and received a judgment in his favor.[131]

Second, and most importantly, there is no evidence that Mr. Bauder's not being paid by NOVI was related to his injury. The purpose of workers' compensation law is "partial reimbursement for loss of earning capacity *due to injury*."[132] In other words, workers' compensation disability is based primarily on an impairment in working capacity.[133] As the Board correctly noted, Mr.

119. *Id.* at 672, citing *Bailey v. Litwin Corp.*, 713 P.2d 249, 252, 254 (Alaska 1986).

120. Board Tr. 83–85.

121. Board Tr. 84.

122. July Decision at 12.

123. *Bailey*, 713 P.2d at 254.

124. *Olson*, 818 P.2d at 673.

125. *Id.* at 671–72.

126. *Id.* at 674.

127. *Id.* at 673.

128. *Id.* at 674.

129. *Bailey*, 713 P.2d at 251–52.

130. Tr. 86.

131. Board Tr. 101.

132. *Wagner v. Stuckagain Heights*, 926 P.2d 456, 458–59 (Alaska 1996) (citations omitted) (emphasis added).

133. *Vetter v. Alaska Workmen's Comp. Bd.*, 524 P.2d 264, 266 (Alaska 1974).

Bauder's failure to be paid for his work at NOVI was not related to his work injury. Therefore he is not entitled to temporary benefits during the time he was employed by NOVI.[134]

## VII. ADJUSTMENT IN COMPENSATION RATE

Mr. Bauder argues that the workers' compensation administrator and subsequently the Board miscalculated the amount of temporary total disability benefits he was entitled to. Under AS 23.30.185, the compensation rate for temporary total disability benefits is calculated by taking 80% of the injured employee's "spendable weekly wages." An employee's "spendable weekly wages" are defined in former AS 23.30.220(a), which at the time of Mr. Bauder's injury, provided:

(a) The spendable weekly wage of an injured employee at the time of an injury is the basis for computing compensation. It is the employee's gross weekly earnings minus payroll tax deductions. The gross weekly earnings shall be calculated as follows:

(1) the gross weekly earnings are computed by dividing by 100 the gross earnings of the employee in the two calendar years immediately preceding the injury;

(2) if the employee was absent from the labor market for 18 months or more of the two calendar years preceding the injury, the board shall determine the employee's gross weekly earnings for calculating compensation by considering the nature of the employee's work and work history, but compensation may not exceed the employee's gross weekly earnings at the time of injury[.]

The administrator calculated Mr. Bauder's "spendable weekly wage" under AS 23.30.220(a)(1). The administrator determined that Mr. Bauder had gross earnings over the previous two calendar years before the accident of $23,563.00. Eighty percent of this number after deducting payroll taxes and dividing by 100 as required by the statute is $157.34.[135] The Board agreed with this calculation because it found that Mr. Bauder was absent from the labor market less than 18 months during 1991 and 1992.[136]

Mr. Bauder argues that the Board should have calculated his spendable weekly wage under AS 23.30.220(a)(2) because he claims he was absent from the labor market for 18 months in 1991 and 1992 while he was a student in North Dakota. The issue then is whether there is substantial evidence to support the Board's finding that Mr. Bauder "was absent from the labor market for less than 18 months during 1991 and 1992."

The Board has interpreted "18 months or more of the two calendar years preceding the injury" to mean working less than 183 days of the two previous years or less than 1040 hours of work during those two years.[137] The Board concluded that Mr. Bauder worked 13 weeks in 1991 and roughly 18 weeks in 1992. Therefore, according to the Board's calculations, Mr. Bauder was present in the labor market for a total of 31 weeks, or 7.75 months in 1991 and 1992.[138]

The Board's calculations appear to be supported by substantial evidence. The evidence establishes that Mr. Bauder worked for Alaska Airlines for approximately 12 weeks in the summer of 1991 and he commercial fished for one or two weeks. Similarly, in 1992, the evidence establishes that Mr. Bauder again worked for Alaska Airlines for approximately 12 weeks over the summer and commercial fished for one or two weeks. Additionally, he worked at Alaska Airlines for about 10 days during the Christmas holiday in 1992.

134. *Id.*

135. R. 2. Neither party disagrees with this math. As discussed below, however, Mr. Bauder does dispute the statutory formula used to calculate his "spendable weekly wages."

136. December Decision at 11.

137. *Id.*

138. *Id.*

This evidence establishes that Mr. Bauder was employed for at least 28 weeks (seven months), or to put it in terms of AS 23.30.220(a)(2), Mr. Bauder was absent from the labor market for 17 months during 1991 and 1992.[139] Although the court finds that Mr. Bauder worked for three fewer weeks than the Board, this does not change the Board's determination that AS 23.30.220(a)(2) does not apply. Even by the court's more conservative calculations, Mr. Bauder was not "absent from the labor market for 18 months or more of the two calendar years preceding the injury."

As an alternative method of determining whether AS 23.30.220(a)(2) applies, the Board calculated the number of hours that Mr. Bauder worked in 1991 and 1992. The Board found that Mr. Bauder worked 1705 hours during these two years. In arriving at this conclusion, the Board relied on Mr. Bauder's testimony that he worked on average 55 hours a week.[140]

This calculation is problematic because it appears that Mr. Bauder's answer about the number of hours he worked had to do with the summer of 1993.[141] The number of hours worked by Mr. Bauder in 1993 is not relevant. The issue is the number of hours worked in the two calendar years preceding the injury, 1991 and 1992.

Another way to calculate the number of hours Mr. Bauder worked in 1991 and 1992 is to divide his income by his hourly wage. In 1991, Mr. Bauder earned $6,131.57[142] at Alaska Airlines and was paid $9.70 per hour.[143] Thus, he worked approximately 632 hours in 1991 at the airline. Similarly, in 1992, Mr. Bauder earned $8,355.94[144] at Alaska Airlines and was paid $11.63 per hour.[145] Thus, he worked approximately 718 hours in 1992. Based on his yearly earnings and hourly wage, Mr. Bauder worked for a total of approximately 1350 hours for Alaska Airlines in 1991 and 1992.

But, as pointed out by Mr. Bauder, this calculation is also problematic because it fails to take into account overtime pay. Similarly, Mr. Bauder asserts that because he sometimes worked only part-time, and not seven days a week, the court should subtract some workdays from the total concluded by the Board.

The administrator argued and the Board found that Mr. Bauder bore the burden of proof on these issues and that he failed to provide the evidence that would establish that he was absent for more than 18 months over those two years. Mr. Bauder forcefully argues that this was a misapplication of the burden of proof. He also argues that applying this formula to his circumstances does not address his actual loss and therefore is unconstitutional. But the court need not resolve these disputes because even if the Board applied subsection (a)(2) of the statute, the result would be the same.

The Alaska Supreme Court has determined that AS 23.30.220(a)(1) may be unconstitutional in certain circumstances. In *Gilmore v. Alaska Workers' Compensation Board*,[146] the court expressed its concern that the formula may, in some cases, lead to an unfair earning determination. The court explained:

> Because this formula divides the employee's total gross wages over the two year period by 100 regardless of how many weeks the employee actually worked during this period, the employee's actual wage earning capacity during periods of employment is reduced in proportion to any period in which the employee was unemployed for any reason. The resulting benefits therefore may only be randomly related to the injured worker's actual loss. This formula applies regardless of any discrepan-

---

**139.** This calculation gives Mr. Bauder the benefit of the doubt by assuming that he commercial fished for only one week in both 1991 and 1992.

**140.** Board Tr. 63. Fifty-five hours per week times 31 weeks of work equals 1705 hours.

**141.** Board Tr. 62–63.

**142.** R. 795, Board Tr. 47.

**143.** Board Tr. 119.

**144.** R. 788.

**145.** Board Tr. 63.

**146.** 882 P.2d 922, 929 n. 17 (Alaska 1994).

cy, no matter how large, between the result of the formula and the actual wages lost by the employee during the period of his or her disability.[147]

But the Board specifically addressed this issue. The Board determined that:

The employee's tax records and his testimony show the employee's work for the employer during 1991 and 1992 was reasonably consistent with his earnings and pattern of work for the period of the disability. We find that the application of AS 23.30.220(a)(2) would not have substantially altered his compensation rate, in any event. The employee had a consistent pattern over a number of years, working for this employer and going to college to prepare for career employment. The employee moved into aviation career (or career preparation) work almost immediately after graduation.

If we consider the nature of the employee's work and work history under AS 23.30.220(a)(2), we find the employee would have continued the pattern of work and study during the period he received [temporary total disability] benefits.[148]

The reliability of Mr. Bauder's past work history as a predictor of his earning potential during the time he is entitled to temporary total disability benefits presents a factual issue. Therefore, the court must determine "whether the evidence relied on [by the Board] was substantial in light of the record as a whole."[149]

█ A primary purpose of Alaska's workers' compensation laws "is to predict accurately what wages would have been but for a worker's injury."[150] Under *Gilmore* the issue is whether Mr. Bauder's past work history is an accurate predictor of his future earning capacity.[151] "[W]here past wage levels are accurate predictors, the Board must apply the statutory formula [AS 23.30.220(a)(1)]."[152]

█ The Board found, and Mr. Bauder does not dispute, that in 1991 and 1992 Mr. Bauder worked as a seasonal employee for Alaska Airlines. However, Mr. Bauder disagrees with the Board's conclusion that he would have continued to attend school and work as a seasonal employee during the time he received temporary benefits. Mr. Bauder argues that the Board ignored his testimony that he would have foregone school and accepted a full-time yearly position working as a ramp agent had it been available.[153] Further, Mr. Bauder testified that by 1995 or 1996 he would have had enough seniority to hold a full-time position.[154]

Mr. Bauder correctly notes that the Alaska Supreme Court has recognized that " 'intentions as to employment in the future are relevant to a determination of future earning capacity' in determining proper compensatory awards"[155] and that "[l]imited working hours following injury are not particularly relevant to a determination of a worker's probable work patterns had no injury been sustained."[156] But there is substantial evidence in the record to support the Board's conclusion that the temporary benefits accurately reflect Mr. Bauder's wage loss because of the injury.

Mr. Bauder has wanted to fly since at least 1988. His initial interest in working for Alaska Airlines was to pursue this goal. By 1990, he started a work pattern that would allow him to achieve his goal. He began college to pursue a degree in aviation administration and he started to fly. He went to school during the school year, and like untold

147. *Gilmore,* 882 P.2d at 924.

148. December Decision at 11–12.

149. *Thompson,* 975 P.2d at 690.

150. *Id.* at 689.

151. *Id.* at 690.

152. *Id.* at 689.

153. Board Tr. 102–03.

154. Board Tr. 170.

155. *Thompson,* 975 P.2d at 690, quoting *State Dep't of Transp. & Pub. Facilities v. Gronroos,* 697 P.2d 1047, 1049 n. 2 (Alaska 1985) (citation omitted).

156. *Id.* at 691.

numbers of other college students, he worked during the summers and, sometimes, over the Christmas school breaks to support his education.

Mr. Bauder was never a full-time, year-round employee and for good reason. Working as a ramp agent would not have allowed him to get the education and flying time he needed to be a pilot.[157] He was a seasonal employee who worked to support his college education. To require Alaska Airlines' insurance company to pay him benefits as if he were a full-time, year-round employee would not accurately reflect Mr. Bauder's work history.

In addition, according to Alaska Airlines workers' compensation manager Donna Eglund, there were no full-time ramp-agent positions available for Mr. Bauder.[158] In light of these factors, the Board's conclusion that Mr. Bauder would have continued to attend school full-time while working seasonally for Alaska Airlines is supported by substantial evidence.

Finally, Mr. Bauder argues that the disparity between his weekly earnings prior to his injury[159] and his weekly compensation rate of $157.34 is unconstitutional because it is "grossly unfair." However, *Gilmore* does not stand for the proposition that a discrepancy between what an employee was earning at the time of his injury and his compensation rate under AS 23.30.220(a)(1) makes the application of the statute unconstitutional.[160]

Instead, the goal is to compensate injured workers "based on their actual losses."[161] As already discussed, it is undisputed that during the two years prior to his injury, Mr. Bauder was a college student and a seasonal employee[162] who worked during the summers in 1991 and 1992 and during the Christmas holiday in 1992.

Therefore, Mr. Bauder's employment with Alaska Airlines in 1991 and 1992 accurately reflected the circumstances existing at the time of his injury.[163] Under either subsection (a)(1) or subsection (a)(2) of AS 23.30.220, the temporary total disability benefits were an accurate reflection of Mr. Bauder's wage loss.[164]

## VIII. FRIVOLOUS OR UNFAIR CONTROVERSION

Mr. Bauder argues that the Board erred by failing to conclude that the workers' compensation administrator frivolously and unfairly controverted his right to benefits. Of the three controversions filed in this case, Mr. Bauder focuses on the controversion of his right to a lump sum payment of permanent partial impairment benefits filed on July 1, 1997.[165] The relevant statute, AS 23.30.155(*o*), provides as follows:

157. Board Tr. 114.

158. Board Tr. 113–14. Further, there is no evidence in the record to support Mr. Bauder's assertion that he had enough seniority to qualify for a full-time yearly ramp position at Alaska Airlines by 1995 or at the latest in 1996. Board Tr. 170–71.

159. In his brief on appeal, Mr. Bauder asserts that his weekly earnings in 1991–1993 were approximately $900. In his reply brief, he states that his weekly earnings prior to his injury were $639.65. Finally, at oral argument, Mr. Bauder's attorney said that Mr. Bauder's weekly earnings in 1991 and 1992 were approximately $450 or $500.

160. *Thompson,* 975 P.2d at 689 ("the disparity is only relevant if past wages do not accurately predict future earning potential. The disparity does not per se indicate a lack of predictive value.").

161. *Gilmore,* 882 P.2d at 928.

162. In *Gilmore,* the court noted with disapproval that Alaska is "the only state which includes significant periods of unemployment in calculating the worker's average wage without requiring a preliminary finding that the worker was employed in a seasonal occupation at the time of the injury." *Gilmore,* 882 P.2d at 929.

163. *Id.*

164. *See Deuser v. State,* 697 P.2d 647, 650 n. 2 (Alaska 1985), quoting 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 60. 21(c), at 10–592 (1983) ("If claimant's part-time relation to the labor market is 'clear, *and above all if there is no reason to suppose it will change in the future period into which disability extends,* then it is unrealistic to turn a part-time able-bodied worker into a full-time disabled worker.' ") (emphasis in LARSON).

165. R. 14.

The board shall promptly notify the division of insurance if the board determines that the employer's insurer has *frivolously or unfairly controverted compensation due* under this chapter. After receiving notice from the board, the division of insurance shall determine if the insurer has committed an unfair claim settlement practice under AS 21.36.125.[166]

The Board considered three arguments supporting the administrator's position that the controversions were not frivolous but only two arguments involve the July 1, 1997 controversion. One of those arguments, that Mr. Bauder committed fraud, was sharply rejected by the Board.[167] The Board found very little evidence of fraud and found that the evidence presented about that investigation was hearsay.[168]

But the Board did find that at the time of the controversion, Mr. Bauder was being considered for "reemployment benefits." According to the Board, during this evaluation and determination phase for reemployment benefits, an employee is not entitled to receive a lump sum impairment award.[169]

Furthermore, the July 1, 1997 controversion did not contest the payment of permanent partial impairment benefits; it just contested a lump sum payment.[170] Therefore, the Board's conclusion that the July 1, 1997 controversion was not frivolous or unfair because it did not deny Mr. Bauder any "compensation due" under AS 23.30.155(*o*) is supported by substantial evidence.

## IX. PENALTIES, INTEREST, ATTORNEY'S FEES AND COSTS

In its July 6, 1997 decision, the Board denied and dismissed Mr. Bauder's claim for penalties and his claim for interest, but awarded him $3,125 in attorney's fees and $1,168.92 in costs under AS 23.30.145(b).

In his opening brief, Mr. Bauder requested that

the maximum statutory penalties be assessed against the employer, due to the substantial and egregious underpayment, the refusal to pay amounts clearly and undisputedly due, and the failure of the employer to come forward with any substantial evidence to support its controversion or its failure to pay the proper amount of compensation which was due.

Indeed, had the employer properly considered Bauder's eligibility under the alternative method of computation of his TTD rate, the problems that are now presented by the lack of detailed records as to the number of days or hours which he worked would not be present.

Furthermore, substantial and intentional violations of the statutes and regulations applicable to compensation proceedings have occurred in this case. Therefore, all unpaid amounts should have interest assessed, and all attorney's fees incurred by the employee should be awarded.[171]

Mr. Bauder's arguments for penalties, interest, attorney's fees, and costs are dependent on his successful overturning of the Board's decision on the other issues raised in his appeal. Because the court has upheld the Board's decision, there is substantial evidence supporting the Board's conclusions regarding penalties, interest, attorney's fees, and costs.

## X. CONCLUSION

For the foregoing reasons, the decision of the Alaska Workers' Compensation Board is

---

166. Emphasis added.

167. July Decision at 13.

168. *Id.*

169. AS 23.30.041(k). Neither party disputes the Board's findings on this issue.

170. R. 14; Board Tr. 138–39, 143–44.

171. Mr. Bauder's Opening Brief at 16. (Citations to record omitted.)

affirmed. The Board reserved the issue concerning the overpayment of temporary total disability benefits until after the decision on appeal. The case is therefore remanded to the Board to resolve this final issue.

Dated at Wrangell, Alaska, this 29 day of August, 2000.
LARRY C. ZERVOS
Superior Court Judge.