**Bert E. MAY, Appellant,**

v.

**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.**

**Nos. S–12451, S–12452.**

Supreme Court of Alaska.

Dec. 21, 2007.

Rehearing Denied Feb. 21, 2008.

Michael W. Holman, Ketchikan, for Appellant.

Vanessa M. Lamantia, Assistant Attorney General, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Bert May challenges the denial by Commercial Fisheries Entry Commission (CFEC) of his applications for entry permits in the Southern Southeast Inside sablefish (black cod) longline and pot fisheries. May contends that CFEC erred in its determinations that he was ineligible to apply for permits in the fisheries and that he was not entitled to any points. He also claims CFEC erred in determining the maximum number of permits for both fisheries. CFEC was correct in determining that May was not entitled to any points. But CFEC's determination that May was not eligible to apply for a permit in the longline fishery was not supported by substantial evidence. Thus, May has standing to challenge the maximum number in that fishery, and we remand for consider-

ation of that challenge. Because CFEC properly determined that May was not eligible to apply for a permit in the pot fishery, we affirm the superior court's decision upholding CFEC's determinations in the pot fishery.

## II. FACTS AND PROCEEDINGS

In 1973 the Alaska Legislature enacted the Limited Entry Act,[1] which established the Commercial Fisheries Entry Commission and "charged it with the duties of regulating entry into the commercial fisheries for all fishery resources in the state and establishing priorities for application of the chapter to the various commercial fisheries in the state."[2] CFEC determines the maximum number of permits for each fishery and establishes qualifications for the issuance of permits.[3]

CFEC limits participation in the Southern Southeast Inside longline and pot fisheries.[4] CFEC established eighteen as the maximum number of entry permits for the longline fishery and three as the maximum number of entry permits for the pot fishery.[5] CFEC distributes the permits on a point system that determines applicants' order of priority based on past participation in the fishery and economic dependence on the fishery, as measured by income dependence and vessel investment.[6]

In November 1987 Bert May applied for entry permits in the longline and pot fisheries. May claimed a total of forty-four points, including twenty-nine points for past participation as a skipper in 1980 and 1981[7] and fifteen points for vessel investment. May subsequently amended his claim of points to include extraordinary circumstances points

---

1. *See* ch. 79, § 1, SLA 1973; AS 16.43.010-.990 (2006).

2. *Cleaver v. State, Commercial Fisheries Entry Comm'n,* 48 P.3d 464, 465 (Alaska 2002) (citation omitted) (internal quotations omitted).

3. AS 16.43.100(a)(6); AS 16.43.100(a)(9).

4. 20 Alaska Administrative Code (AAC) 05.310(f)(2) (2006).

5. 20 AAC 05.320(e)(2). CFEC had previously determined that twelve was the maximum num-

ber in the longline fishery, but it amended the regulation to make eighteen the maximum number after researching May's petition for administrative review.

6. 20 AAC 05.707; 20 AAC 05.709.

7. At a hearing on November 4, 1988, May clarified that he wished to claim fourteen points for participation in 1980 and fifteen points for extraordinary circumstances in 1981.

for 1982 through 1984, so that his claim totaled eighty-five points.[8] On both applications May claimed eligibility to apply based on participation in 1980. He submitted his own affidavit, along with affidavits from members of his crew and from Freeman McGilton, manager of the Annette Island Packing Company (AIPC) in 1980. May's affidavit stated:

> In February and March of 1980, I began fishing for black cod using pots. We weren't catching enough fish using pots so I decided to change to longline gear. We went back to port and changed our gear to longline gear.... [W]e went back to the Southern Clarence Straight[ ] area and also fished outside [Noyes] island. We took our black cod longline catch to the cold storage area in Metlakatla.... I specifically remember selling these fish to Fre[e]man McGilton of the Annette Island Cold Storage.

McGilton's affidavit also recalled May's sale of longline-caught black cod to AIPC. The affidavits from May and McGilton characterized the market for black cod in 1980 as "sour" and "very poor." McGilton indicated that because the market was not viable, AIPC bought the fish to sell to other fishermen as bait.

In letters dated February 24, 1988 and March 3, 1988, CFEC informed May that it denied his applications. The letters explained that CFEC found May ineligible to apply because it had "no records of his participation or making legal landings in this fishery between 1975 through 1984."

In a letter dated March 29, 1988, May indicated his desire to contest CFEC's determinations and requested an administrative hearing. On May 19, 1988 and November 4, 1988, CFEC held hearings to evaluate May's claims.

At the May 19, 1988 hearing, hearing officer David A. Ingram read a handwritten note submitted by May[9] and characterized it as "inconsistent with earlier ... evidence." May and a witness, Barry Bracken of the Alaska Department of Fish and Game, testified regarding May's request for a full hearing. May testified that he was properly licensed and fished on the F/V CIGALE in 1980 for black cod and that he had sales in 1980 to AIPC but was unable to produce fish tickets documenting the sales. May stated that he started fishing with pots, but they weren't effective, so he "gave up and we came back in, put on the longline gear." May also testified that he had submitted the undated handwritten letter to explain why he did not fish with the CIGALE after 1980. Barry Bracken testified about regulations in the federal intrusion area, one of the areas May claims to have fished. The hearing officer concluded by finding that there was "a genuine issue for purposes of granting a hearing, so the hearings are granted on both these applications and you'll be issued your interim use permit."

On November 4, 1988, CFEC held another hearing to consider May's applications. As the hearing officer summarized, May testified that he made landings in 1980 "between Point Chacon and Duke Island, directly West of West Rock Island. And then on a curve, down through an area within the contiguous zone, but outside the State waters.... Pretty much straight south of Cape Chacon." May indicated the areas he fished with X's on a map. Some of these marks are south of the AB line—the line traditionally understood, although currently a subject of dispute, to be the dividing line between U.S. and Canadian waters, located at 54 degrees, 40 minutes latitude.

---

**8.** After his administrative hearing, May submitted documentation claiming extraordinary circumstances points for 1981 through 1984 based on the "unanticipated and unavoidable" "[a]ctions of his former wife in forcing the sale of the vessel." 20 AAC 05.707(a) and 05.709(a) provide that a maximum of seventy points are available for past participation. May claimed the maximum of seventy points plus fifteen points for vessel investment for a total of eighty-five points.

**9.** The handwritten, undated note stated:

> In the spring of 1980 there was no market for Black Cod, so after spending more than $400,000.00 getting the [F/V CIGALE] ready to catch and freeze Black Cod, my wife could not stand the pressure so I had to sell the [CIGALE] to settle the [divorce]. Now I am getting a new boat and would like to try again.

Bracken testified that the areas directly south of Cape Chacon were included in the definition for the Southern Southeast Inside area and indicated that "anyone fishing during 1980 with a statewide sable fish permit, in the area below the AB line would have been fishing legally." Bracken affirmed the hearing officer's understanding that "north of the [AB] line, any fishing he did in [19]80 would have been illegal, south of the [AB] line it was legal." Ron Berg, a biologist with the National Marine Fisheries Service, testified that the State had authority in 1978 to regulate fishing north and south of the AB line.

On December 31, 2002, the hearing officer denied May's entry permit applications. The hearing officer concluded that May was not eligible to apply for a permit because his claims that he participated in the fisheries in 1980 failed. The hearing officer concluded that May "probably caught black cod with longline gear north of the [AB] line ... [but not] south of that line." He reasoned that May's "landings north of the [AB] line were illegal since the area was not open at the time." The hearing officer also concluded that May "did not catch black cod with pot gear anywhere in 1980 other than the outside federal waters off Noyes Island." He also determined that May failed to prove a commercial harvest in 1980, concluding that AIPC "issued no fish ticket ... because Mr. May was not selling commercial caught fish. He was merely reselling bait that he had earlier purchased from AIPC or elsewhere." Before deciding that May had not proved his eligibility to apply, the hearing officer also noted May's failure to produce a fish ticket and "considerable vagueness and uncertainty surrounding the way things worked in 1980." The hearing officer also found that May failed to prove points based on past participation or extraordinary circumstances and

failed to prove investment in a vessel that he intended to use in the fishery.

May requested administrative review of the denials. In January 2004 CFEC issued its final decisions denying May's applications. CFEC admitted that it was a close question whether May's activity in 1980 rendered him eligible, but ultimately affirmed the hearing officer's determination that May was not eligible to apply for a permit in either fishery.

CFEC also determined, that, even if May were eligible to apply, he failed to demonstrate that he qualified for sufficient points to be awarded a permit. CFEC rejected May's claim for past participation points based on extraordinary circumstances in 1981–1984, concluding that May's failure to participate was the result of "the failure of a business venture due to the loss of the financial means to continue participation"[10] rather than a result of extraordinary circumstances. Finally, CFEC held that May lacked standing to challenge the maximum number of permits in the fisheries.[11]

May appealed CFEC's final decision to the superior court. Superior Court Judge Trevor N. Stephens upheld CFEC's decision. May appeals.

## III. STANDARD OF REVIEW

In administrative appeals, we directly review the merits of the agency decision.[12] We have recognized four principal standards of review for administrative decisions: the "substantial evidence" test applies to questions of fact; the "reasonable basis" test applies to questions of law involving agency expertise; the "substitution of judgment" test applies to questions of law where no expertise is involved; and the "reasonable and not arbitrary" test applies to review of administrative regulations."[13]

When reviewing an agency's interpretation of its own regulation, we apply the

---

**10.** CFEC quoted 20 AAC 05.703(d), which provides that "[e]xtraordinary circumstances do not include ... loss of the financial means to continue participation in the fishery."

**11.** CFEC did note that it researched May's claim that twelve was not the appropriate maximum number in the longline fishery. CFEC later

changed the regulation to reflect a maximum number of eighteen in that fishery.

**12.** *Cleaver v. State, Commercial Fisheries Entry Comm'n*, 48 P.3d 464, 467 (Alaska 2002).

**13.** *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

"reasonable basis" standard.[14] We defer to the agency unless its "interpretation is 'plainly erroneous and inconsistent with the regulation.' "[15] When reviewing factual findings, we apply the substantial evidence test.[16] Substantial evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion."[17]

## IV. DISCUSSION

### A. Longline Fishery

#### 1. CFEC erred when it determined that May was not eligible to apply for a permit in the longline fishery.

An applicant must establish that he or she is eligible to apply for a permit. To establish eligibility for the Southern Southeast Inside longline fishery, an applicant must prove that he or she "harvested the fishery resource commercially while participating in the fishery as the holder of a gear license ... and an interim-use permit ... during at least one of the calendar years 1975–1984."[18] "Participation" is defined as:

> Active engagement in a commercial fishing operation that harvested and sold the sablefish resource in the fishery for which the applicant is applying if the sablefish sales were in accordance with regulations governing the sale or use of commercially caught sablefish applicable at the time of sale, including regulations regarding proper completion of reports required of processors, buyers, and fishermen.[19]

In sum, to establish eligibility an applicant must prove both a commercial harvest and that participation took place within the boundaries of the fishery while properly licensed.

■ May challenges CFEC's determination that he was not eligible to apply for a permit in the longline fishery. CFEC based its determination on its findings that May did not participate in the fishery and did not prove a commercial harvest. May contests both findings.

May first contends that CFEC erred when it determined that he did not participate in the fishery. This question turns largely on where May fished in 1980 and whether he submitted adequate documentation to support his claim of where he fished. The affidavits from his crew and from May himself indicated that they fished in Southern Clarence Strait and in the waters outside Noyes Island.

During the November 4, 1988 hearing, May indicated the areas he fished with an X. As CFEC summarized, the "marks are all in waters between 132 degrees 20' and 131 degrees 40' West longitude, and 54 degrees 30' and 54 degrees 50' North latitude." Barry Bracken had testified that although the waters above 54 degrees 40' North latitude (the AB line) were closed, the waters below that line were open.[20]

In his decision, the hearing officer stated that "[i]n deciding where Mr. May probably fished in 1980, and with what kind of gear, one has to choose which version of the events to believe, his testimony at the hearing or his earlier statement, which is in accord with the statements of his crew." The hearing officer concluded:

> [May] probably fished with longline gear in the southern part of Clarence Strait, probably north of the [AB] line and possibly south of it, and then went back to the federal waters outside Noyes Island.... The record supports a finding that Mr. May probably caught black cod with longline gear north of the [AB] line (the federal intrusion zone in the southern part of Clar-

---

**14.** *Simpson v. State, Commercial Fisheries Entry Comm'n*, 101 P.3d 605, 609 (Alaska 2004).

**15.** *Id.* (quoting *Lauth v. State*, 12 P.3d 181, 184 (Alaska 2000)).

**16.** *Cleaver*, 48 P.3d at 467 (internal citation and quotations omitted).

**17.** *Id.*

**18.** 20 AAC 05.703(a); *see also* AS 16.43.260(a).

**19.** 20 AAC 05.713(7).

**20.** Ron Berg testified that the federal fisheries management plan at the time did not include waters east of 132 degrees 40' West longitude (the waters in which May indicated that he fished) and claimed that the State could have asserted management over the area both north and south of the 54 degree 40' line.

ence Strait) but it does not support a finding that he did so south of that line.... Unfortunately, his landings north of the [AB] line were illegal since the area was not open at the time, and his landings in outside federal waters were far beyond the area included in Southeastern Alaska....

In deciding that May was not eligible, the hearing officer also noted "considerable vagueness and uncertainty surrounding the way things worked in 1980...."

But as the hearing officer recognized, despite any uncertainty, it was undisputed that any fishing May did south of the AB line was legal. And May himself indicated that he fished below the AB line. May's earlier affidavit and those of his crew confirm that he was fishing in the general geographic area. Contrary to the hearing officer's suggestion, these affidavits are not inconsistent with a finding that May caught fish south of the AB line. Although the affidavits do not give an exact latitude sufficient to prove exactly how far south May fished, they do not contradict a finding that May fished south of the AB line. Yet despite the affidavits of May's crew, May's own testimony, and the hearing officer's note that May "possibly fished south of [the AB line]," the hearing officer inexplicably concluded that May did not catch black cod south of the AB line. Under these circumstances, this determination is not supported by substantial evidence.

Similarly, CFEC's determination that May did not prove a commercial harvest is based on speculation rather than substantial evidence. In contesting CFEC's finding, May points to his own affidavit and testimony—along with affidavits from his crew and an AIPC manager indicating that he sold black cod and a ledger sheet from AIPC—as proof of his commercial sale. May maintains that the hearing officer's conclusion that May merely resold bait to AIPC and sold black cod to other fishermen—not to AIPC—amounts to speculation and theory that is not supported by substantial evidence. We agree.

During his hearings, May testified that he sold longline-caught black cod to AIPC in

1980. May also submitted affidavits from members of his crew recalling the catch and sale of black cod with longline gear, as well as an affidavit from Freeman McGilton, manager of AIPC, who indicated that he bought longline-caught black cod from May in 1980. May also submitted an accounts receivable ledger from AIPC along with a letter stating that "it appears that Mr. May did sell black cod to Annette Island Packing Company in [1980]."

Despite this evidence, the hearing officer reasoned that AIPC "issued no fish ticket because Mr. May was not selling commercially caught fish." He concluded:

The bait Mr. May sold to AIPC on May 13 was probably part of the bait he purchased for his pots before going out to federal waters off Noyes Island with the [CIGALE]. It probably stayed frozen in the [CIGALE'S] freezer, and when his disastrous attempts to fish for black cod ended, he was left with a surplus of bait, which he then sold to (or back to) AIPC.... It appears more likely than not that Mr. May did not sell black cod to AIPC in 1980 but, rather, sold a total of 691 pounds of black cod to someone, perhaps another fisherman, and AIPC merely advanced him the amount to be paid by the buyer.

But as May notes, this conclusion is based solely on speculation. And this speculative conclusion contradicts the sworn affidavits of May, his crew, and Freeman McGilton, manager of AIPC.[21] Under these circumstances, the hearing officer's decision that May did not commercially harvest sablefish with longline gear is not supported by substantial evidence.

In upholding the hearing officer's decision, CFEC noted May's failure to produce fish tickets and concluded that "[s]uch an unauthorized landing would not be entitled to credit toward eligibility." In its brief before this court, CFEC does not argue that the failure to produce fish tickets is dispositive—indeed such an argument would be inconsistent with CFEC's own precedent. In *Kru-*

---

21. The affidavits explained that AIPC bought the fish to be used as bait because the market for black cod in 1980 was not "viable."

*mal,*[22] *Ayojiak,*[23] and *Weis,*[24] CFEC found applicants eligible despite a lack of fish tickets. In those cases, CFEC excused the lack of fish tickets where applicants had explanations for their inability to produce the tickets and where evidence supported a finding that applicants had commercially harvested the resource while properly licensed.

Though not dispositive, CFEC argues that May's "failure to produce a fish ticket raises an inference that a landing may not have occurred, or if it did occur, may have been unauthorized and cannot be used to demonstrate eligibility."[25] CFEC goes on to contend that May failed to overcome this inference because he never explained the absence of fish tickets and never proved a commercial harvest.

But as we explained above, the record supports a conclusion that May commercially harvested sablefish with longline gear. Moreover, he did offer an explanation for the lack of fish tickets. During his May 19, 1988 hearing, May admitted that he was unable to produce fish tickets to support the sale of sablefish in 1980. May's counsel explained that May attempted to obtain fish tickets from AIPC. However, he did not succeed:

> Freeman said well I don't know, let's go look in the loft. So they went and looked in the loft, and they said no, everything's down in Seattle now, because that's where their home office is. So they went to Seattle and they said we don't know where they are. What we have is accounts receivable sheets which they evidently faxed up to Annette Island, so that Annette Island could figure out where they were.

May's counsel explained that "Annette Island has changed hands three times since this thing was put up. Bert no longer really fishes for them. So they're not really helpful." Thus, contrary to CFEC's contention, May did offer an explanation as to why he did not have fish tickets. Taken together, the affidavits and testimony that May submitted to prove his commercial harvest, along with this explanation for his failure to produce fish tickets, overcome any negative inference resulting from May's failure to produce fish tickets. As a result, we conclude that CFEC erred when it determined that May was not eligible to apply for a permit in the longline fishery.

**2. CFEC did not err in declining to award past participation points based on extraordinary circumstances.**

CFEC determines applicants' order of priority using a points-based system that awards points for past participation in the fishery and economic dependence on the fishery.[26] CFEC determined that, even if May were eligible to apply for a permit, he had not established that he qualified for any points. May contests this determination, claiming he is entitled to past participation points based on extraordinary circumstances.

CFEC awards up to seventy points for past participation in the fishery.[27] To be eligible for skipper participation points, an applicant must have commercially harvested at least 1,000 pounds of sablefish in the longline fishery and 2,000 pounds of sablefish in the pot fishery as a skipper.[28] Skipper par-

---

**22.** CFEC 90–105 (1994) (finding applicant eligible despite lack of fish ticket where evidence suggested a pattern of problems with processor providing fish tickets).

**23.** CFEC 75–514 (1983) (finding applicant eligible despite lack of fish tickets where Commission had recognized "problems with landing records in the area").

**24.** CFEC 00–038–A (2001) (finding applicant eligible despite lack of fish tickets where there was "evidence from witnesses [of commercial harvest] and [applicant produced] the weight slip for a delivery ... by a diver who accompanied" the applicant).

**25.** The definition of "participation" under 20 AAC 05.713(7) states that sales "must be in accordance with regulations governing the sale or use of commercially caught sablefish applicable at the time of sale, including regulations regarding proper completion of reports required of processors, buyers, and fishermen." Regulations require submission of fish tickets within seven days after landing. 5 AAC 39.130.

**26.** 20 AAC 05.707.

**27.** 20 AAC 05.707(a); 20 AAC 05.709(a).

**28.** 20 AAC 05.707(a)(1)(A); 20 AAC 05.709(a)(1)(A). The regulation continues:
> A rebuttable presumption exists that the applicant was a crewmember and not a skipper for

ticipation points are available for the 1982 through 1984 seasons.[29]  In addition, those who are eligible for points for the 1982, 1983, or 1984 seasons may also claim points for the 1975 through 1981 seasons.[30]  May does not claim to have participated in the years 1982 through 1984.  As a result, he is not eligible for past participation points unless he can demonstrate that extraordinary circumstances prevented him from participating in 1982, 1983, or 1984.

CFEC regulations provide:

> If extraordinary circumstances prevented an applicant from participating in the fishery in a given season, the commission will, in its discretion, award the applicant those points the applicant could reasonably have claimed but for the extraordinary circumstances.  Extraordinary circumstances include temporary illness or disability, the loss of a vessel or equipment through sinking, destruction, or extensive mechanical breakdown, and other similar objectively verifiable causes of non-participation.  Extraordinary circumstances do not include, for example, voluntary or involuntary retirement from the fishery, permanent illness, permanent disability, or loss of the financial means to participate in the fishery.[31]

May contends that he proved extraordinary circumstances when he testified that he was forced to sell the CIGALE in 1981 when his marriage dissolved.  He argues that this was a moral obligation, that circumstances were "sudden and beyond his control."  As a result, he concludes that extraordinary circumstances prevented him from participating in 1982 and claims that he should be awarded points for at least 1980 through 1982 in the

pot fishery and for 1975 and 1980 through 1982 in the longline fishery.

■  We hold that CFEC properly denied May's claim for past participation points.  As May recognizes, 20 AAC 05.707(a)(1)(C) and 20 AAC 05.709(a)(1)(C) require that an applicant be eligible for points in 1982, 1983, or 1984 before he can claim points for previous years.  May's only claim for points in 1982 through 1984 is his extraordinary circumstances claim, which CFEC properly denied.

■  In *Cleaver v. State, Commercial Fisheries Entry Commission,* we upheld the hearing officer's determination that an applicant with mechanical problems did not meet the three-part test for extraordinary circumstances.[32]  This test requires an applicant to show: (1) specific intent to participate; (2) that extraordinary circumstances prevented participation;  and (3) that the applicant made all reasonable [or possible] efforts.[33]  We noted that Cleaver's "lack of experience and appropriate equipment [did] not constitute extraordinary circumstances."[34]

Similarly, May cannot show extraordinary circumstances.  As the hearing officer noted, May had another vessel—the F/V SATELLITE—which he could have used in the years 1982 through 1984 but elected not to use.  When asked at his November 4, 1988 hearing why he did not fish with the SATELLITE, May testified that his wife was "after half of any income that I had prior to the divorce.  So I couldn't do anything without giving her half."  When asked if there was any other reason, he testified that "the price was terrible."  In other words, May made no showing of any intent to participate, nor did he demonstrate how-even if it qualified as an extraordinary circumstance[35]—the sale of the CIGALE prevented him from using the SATELLITE.  Be-

---

that season if the applicant had only one day with landings in the fishery and the sablefish poundage from that day's landings represented less than 15 percent of the total sablefish poundage delivered from the vessel during that season in the fishery.

29.  20 AAC 05.707(a)(1)(B); 20 AAC 05.709(a)(1)(B).

30.  20 AAC 05.707(a)(1)(B); 20 AAC 05.709(a)(1)(B).

31.  20 AAC 05.703(d).

32.  48 P.3d 464, 468–70 (Alaska 2002).

33.  *Id.*

34.  *Id.* at 469.

35.  As CFEC noted in its final decision, the extraordinary circumstances provision specifically excludes the "loss of the financial means to continue participation in the fishery."

cause May does not meet the test for extraordinary circumstances, CFEC properly refused to award him past participation points.

### 3. CFEC did not err in declining to award vessel investment points.

■ CFEC regulations provide that "[a]n applicant may claim 15 points for investment, as of January 1, 1985, in a vessel that the applicant *used or intended to use* in the Southern Southeast Inside sablefish" fishery.[36] To be eligible for vessel investment points, an applicant must demonstrate "that the sum of the applicant's annual catch values for the years 1982–1984 is at least $1,000." [37] May argues that he should be granted fifteen points for vessel investment because he "still owned the [SATELLITE] on and after the qualification date and, but for the extraordinary circumstances … [that required the sale of the CIGALE,] he would likely have harvested at least $1,000 worth of sablefish in 1982–1984."

But May points to no evidence that he used or intended to use the SATELLITE in the fishery. Indeed, he testified that the SATELLITE was seaworthy and that he still had some pots and longline gear, yet he did not use the vessel in the fishery. Instead, he suggests that he intended to use it but was somehow prevented from doing so by the sale of the CIGALE. But he does not explain how that sale prevented him from using the SATELLITE in the fishery. May's own testimony that he did not use the SATELLITE because of his divorce and the low price contradicts his argument that he intended to use the SATELLITE in the fishery. Based on this testimony, CFEC's conclusion that May did not use or intend to use the SATELLITE in the fishery in 1982 through 1984 is supported by substantial evidence. As a result, CFEC properly determined that May was not entitled to fifteen points for vessel investment.

### 4. CFEC erred when it determined that May lacks standing to challenge the maximum number of permits in the longline fishery.

CFEC may limit participation in a fishery by setting a maximum number of permits.[38] As we explained in *Simpson v. State, Commercial Fisheries Entry Commission,* the maximum number must be at a level no lower than the highest number of participants during any one of the four years prior to limitation of the fishery *and* must "meet the Act's two legislative purposes of 'enabling fishermen to receive adequate remuneration and conserving the fishery.' " [39]

■ May challenges CFEC's determination that eighteen is the maximum number of permits in the longline fishery. He claims that CFEC failed to cite any evidence to support its determination of the maximum number in the fishery and contests CFEC's determination that he does not have standing to challenge the maximum number of permits in the longline fishery.

In its final commission decision, CFEC concluded that May did not have standing to challenge the maximum number because he was not eligible to apply for a permit and because he qualified for zero points.[40] But as explained above, we hold that May was eligible to apply for a permit. And although we affirm CFEC's determination that May was not entitled to points, CFEC does not refute May's contention that even an applicant with zero points could qualify for a permit if the maximum number were higher. As a result, May has an interest in challenging the maximum number of permits.

CFEC also maintains that May has the burden of proof in challenging the maximum number. CFEC quotes our holding in *Simpson* that a person challenging the maxi-

---

**36.** 20 AAC 05.707(b)(3) (emphasis added).

**37.** 20 AAC 05.707(b)(1); 20 AAC 05.709(b)(1).

**38.** AS 16.43.240 (2006).

**39.** *Id.* at 611 (quoting *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1263 (Alaska 1988)).

**40.** In its final decision, CFEC noted that it did further research in response to May's claim and determined that eighteen (not the previously adopted number of twelve) was the highest number of vessels that participated in the four years prior to limitation.

mum number has the burden of showing that the number "was an expression of whim rather than a product of reason." [41] It asserts that May failed to meet this burden and argues that the regulation is presumed valid. CFEC contends that May is attempting to shift the burden of proof and is asking that this court "indulge him in a search of Commission records" to support his proposition that the maximum number should be higher.

CFEC is correct that we held in *Simpson* that an applicant challenging a maximum number must show that the number was the expression of whim.[42] However, unlike in *Simpson*, where CFEC had considered Alaska Department of Fish and Game comments that this fishery was troubled and that even seventy-three might be "too large a number to promote effective management," [43] CFEC points to no documentation explaining its determinations in this case. We therefore cannot conclude as a matter of law that May's contention is without merit. Because CFEC based its determination below on its conclusion that May did not have standing to challenge the maximum number, and because we hold that he does have an interest in challenging the maximum number, we remand for further consideration of his argument.[44]

### B. Pot Fishery

**1. CFEC did not err when it determined that May was not eligible to apply for a permit in the pot fishery.**

To be eligible to apply for a permit in the pot fishery, as in the longline fishery, an applicant must prove that he or she "harvested the fishery resource commercially while participating in the fishery as the holder of a gear license ... and an interim-use permit ... during at least one of the calendar years 1975–1984." [45] Because May bases

his claim of eligibility on his activities in 1980, his eligibility in the pot fishery turns on his ability to demonstrate that he participated in the fishery in 1980 and that he commercially harvested the resource in that year.

May challenges CFEC's determination that he did not prove a commercial harvest using pot gear, as well as its determination that he did not participate in the fishery in 1980. On the question of commercial harvest, he argues that CFEC erred in concluding that he did not prove a commercial harvest with pot gear. He asserts that the hearing officer's conclusion that he did not harvest black cod is based on speculation and maintains that the hearing officer's finding that May did not sell black cod should be reversed.

Although May testified at the hearing that he must have sold black cod caught with pot gear, the affidavits he submitted recall the sale of longline-caught black cod only. For example, Larry Vandehey submitted an affidavit that he was a crewman with May in 1980. He indicated that they began fishing for black cod using pots:

> Those efforts were not very successful so we decided to change to longline gear. Once the gear had been changed, we began fishing in the Southern Clarence Straits area and just outside of [Noyes] Island for black cod using our longline gear. I remember that we sold our longline caught black cod catch to Annette Island Cold Storage that year.

Similarly, Freeman McGilton of AIPC indicated in his affidavit: "I specifically remember buying longline caught black cod from Bert May ... in 1980." None of the affidavits recalls the sale of black cod caught with pot gear.[46]

---

**41.** *101 P.3d at 611 (quoting* Johns, *758 P.2d at 1263).*

**42.** *Id.*

**43.** *Id.* at 608.

**44.** We note that although May has the burden of establishing that the maximum number was an expression of whim rather than the product of reason, this burden does not relieve CFEC from its obligation to respond to requests for informa-

tion regarding the establishment of the maximum number.

**45.** 20 AAC 05.703(a); *see also* AS 16.43.260(a).

**46.** May maintains that the affidavits do not reference black cod caught with pot gear because he submitted those affidavits in support of his longline interim-use permit. But he failed to produce similar affidavits in support of his pot permit, despite having had ample opportunity to do

Because May failed to produce fish tickets to demonstrate sale of black cod caught with pots, he must overcome the negative inference that results from his failure to produce fish tickets. Unlike the longline fishery, where May had his own affidavit, those of his crew, and that of a manager at AIPC to support his claim of a commercial harvest of black cod with longline gear, the only evidence he provided to prove a harvest with pot gear is his statement years later that he "must have" sold black cod caught with pots. In this case, that statement is insufficient to overcome the negative inference that arises from his inability to produce fish tickets.[47] We therefore uphold CFEC's determination that May was not eligible to apply for a permit in the pot fishery.[48]

**2. May lacks standing to challenge the maximum number in the pot fishery.**

May also challenges the maximum number in the pot fishery. But we need not consider an argument without a showing of prejudice.[49] Because we hold that May is not eligible for a permit in the pot fishery, he cannot show that he is prejudiced by any error in setting the maximum number; he is not entitled to a permit regardless of the maximum number.

**V. CONCLUSION**

We hold that CFEC erred in determining that May was not eligible to apply for a permit in the longline fishery, but uphold its points determinations in that fishery. We REMAND the case to CFEC for consideration of his argument regarding the maximum number in that fishery. We AFFIRM

so when he petitioned for administrative review of the hearing officer's decision.

47. Because participation and commercial harvest are both required for eligibility, and because we uphold CFEC's determination that May did not prove a commercial harvest with pot gear, we need not consider his argument that CFEC erred when it determined that he did not participate in the fishery in 1980.

48. Because we hold that May was not eligible to apply for a permit in the pot fishery, we need not consider his argument that CFEC erred in determining that he was entitled to no points for vessel investment or past participation.

the superior court's decision upholding CFEC's determination that May was not eligible to apply for a permit in the pot fishery, and therefore do not consider his arguments regarding the award of points or the maximum number in that fishery.

BRYNER, Justice, not participating.

49. See Younker v. Alaska Commercial Fisheries Entry Comm'n, 598 P.2d 917, 920–21 (Alaska 1979) (holding that we would not consider an argument that preferential treatment of gear license holders discriminated against an applicant where he had not shown injury from that preference); see also Johns v. Commercial Fisheries Entry Comm'n, 758 P.2d 1256, 1262–63 (Alaska 1988) (holding that error in setting a maximum number lower than the historic high did not require reversal where applicant was not prejudiced).