John R. GARNER, Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF MEDICAL ASSISTANCE, Appellee.

No. S–10318.

Supreme Court of Alaska.

Jan. 31, 2003.

James J. Davis, Jr. and Nikole M. Nelson, Alaska Legal Services Corporation, Anchorage, for Appellant.

Dawn M. Carman and Charles T. Huguelet, Assistant Attorneys General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Michael N. Zechman, Disability Law Center of Alaska, Anchorage, for Amicus Curiae.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

John Garner, a severely retarded state Medicaid recipient, challenges the decision of the Department of Health and Social Services, Division of Medical Assistance not to cover the cost of a routine dental exam which he has characterized as medically necessary. Because the record has not been sufficiently developed to determine whether the agency failed to comply either with its own regulations or with the Americans with Disabilities Act, we reverse the superior court's decision affirming the agency's denial of services and instruct the court to remand the case to the agency for further fact finding on these issues. Accordingly, we do not reach the questions of whether the agency's regulations regarding adult dental care comply with the federal Medicaid Act or the equal protection guarantee of the Alaska Constitution.

## II. FACTS AND PROCEEDINGS

Appellant John Garner is a thirty-five year old man who functions at the level of a two-year old. He suffers from severe mental retardation and developmental abnormalities which render him unable to speak, care for himself, or perform any activities of daily life. As a result of his disability, Garner is unable to verbally express to his caregivers what he is feeling or when he is experiencing pain. In the past, this has resulted in the development of severe dental problems which went unnoticed by those around him.

On May 13, 1999 Garner received a comprehensive dental examination and root planing procedure while under general anesthesia for an unrelated medical procedure. A root planing, as described by the representative of the State Division of Medical Assistance, is "an extraordinar[il]y thorough cleaning," beyond what one would normally receive during a teeth cleaning. Garner required this procedure to clear the plaque and gingivitis from his upper gums in order to prevent further bone loss. His doctors chose this path due to Garner's problems cooperating and holding still while conscious. The unique problems of providing otherwise "routine" dental care to a severely retarded adult are explained in the report of one of Garner's dentists:

I first examined John Garner when he was 12 years old. He soon developed periodontal disease at a relatively early age. His mouth accumulates much dental calculus. This calculus is of a tenacious, dark, sub-gingival kind; the sort that causes the gums to hemorrhage and destroys bone. His seizures and developmental delay make the daily prevention of this calculus formation an impossible task. For some years we tried removing this calculus and treating his gums in my office. He was very resistant to this and it was very traumatic to him. We tried different sedative drug cocktails and nitrous oxide. We had as many as six people restraining him, but were still not able to effectively treat his bone destroying periodontal disease.

For his gum disease he needs treatment by a gum specialist, a periodontist, not an oral surgeon. And, the periodontist needs a still patient on which to work. Dr. Remaklus, a periodontist, has been able to limit the destructiveness of John's gum disease by prescribing Peridex, and by treating his gums every three or four years while he is under general anesthesia. These are less than ideal arrangements, but they seem to be showing success at allowing John to not lose all his teeth soon.[1]

The Department of Health and Social Services, Division of Medical Assistance (the agency) denied Medicaid coverage for the exam and root planing procedure, relying on Alaska regulations limiting complete dental

---

1. Letter from Jim H. Case, D.M.D. (Nov. 24, 1999).

coverage to Medicaid recipients under twenty-one years of age, and offering recipients older than twenty-one coverage only for "the immediate relief of pain and acute infection." [2]

Through his mother, Barbara Garner, John Garner sought a hearing before the Division of Medical Assistance, asking the agency to reconsider its decision not to cover his dental exam. At the hearing, Barbara Garner argued that the Medicaid regulations limiting basic dental coverage to recipients under twenty-one years of age should contain an exception for "those with severe disabilities whose age may be chronologically beyond 21, but mentally and physically have an age much under 21," and contended that because the exam constituted a "medical necessity" for John, it should be covered. Because he could not locate any exceptions in the statute, even for those with severe disabilities, the hearing officer upheld the agency's denial of coverage. The director of the Division of Medical Assistance agreed with the hearing officer's decision.

John Garner, then represented by counsel through the Alaska Legal Services Corporation, appealed the agency's decision to the superior court. On appeal, Garner argued that Alaska's Medicaid laws regarding the provision of dental care to adults violated the federal Medicaid Act and the federal and state constitutional guarantees of equal protection. He further maintained that the state's failure to modify its Medicaid pro-

gram to accommodate his need for routine dental care constituted a violation of the Americans with Disabilities Act (ADA). As a corollary to his argument regarding the agency's failure to comply with the Medicaid Act, Garner argued that the agency failed to follow its own regulations in denying his claim. Superior Court Judge Donald D. Hopwood, in a thorough opinion that addressed several difficult issues, upheld the agency decision.

Garner now appeals.[3]

## III. STANDARD OF REVIEW

■ "In an administrative appeal where the superior court acts as an intermediate appellate court, we directly review the agency action in question." [4]

■ We will apply our independent judgment to "legal question[s] that involve[ ] statutory interpretation or other legal issues where the courts have specialized knowledge and experience." [5] Whether the agency correctly interpreted its own regulations is reviewed on the "reasonable basis" standard.[6] However, we independently review whether a regulation applies to a case and we may find abuse of discretion where an agency fails to apply an applicable regulation.[7]

■ Whether the agency complied with the requirements of the ADA is a legal question not involving agency expertise.[8] Accordingly, we will substitute our judgment for that of the agency, "adopt[ing] 'the rule

2. 7 AAC 43.600; 7 AAC 43.620.

3. On appeal, Garner presents three issues for review: whether 7 AAC 43.600 and 7 AAC 43.620 are inconsistent with the federal Medicaid Act or violate the equal protection guarantee of the Alaska Constitution and whether the agency's denial of Medicaid coverage for routine dental care for Mr. Garner violates Title II of the ADA. Notably, Garner does not pursue his claims regarding the federal equal protection clause or the agency's failure to follow its own regulations. However, for the reasons set out *infra* at note 21, we consider the argument that the agency failed to follow its own regulations in today's opinion.

4. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 53 P.3d 578, 583 (Alaska 2002).

5. *Bauder v. Alaska Airlines, Inc.*, 52 P.3d 166, 174 (Alaska 2002); *see also Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska

1992) (discussing application of the substitution of judgment test for questions of law where no agency expertise is involved).

6. *Cleaver v. State, Commercial Fisheries Entry Comm'n*, 48 P.3d 464, 467 (Alaska 2002).

7. *Payton v. State*, 938 P.2d 1036, 1044 (Alaska 1997) (error for Board of Fisheries not to explain why regulation did not allow appellants' actions). *Cf. Cano v. Municipality of Anchorage*, 627 P.2d 660, 663 (Alaska App.1981) (abuse of discretion for court to fail to recognize the legal alternatives open to it).

8. *See Blanas v. Brower Co.*, 938 P.2d 1056, 1060 (Alaska 1997) (reviewing agency's interpretation of AS 23.30.012).

that is most persuasive in light of precedent, reason, and policy.' " [9]

## IV. DISCUSSION

### A. Overview of the Adult Dental Services Provided Under Alaska's Medicaid Program

Title XIX of the Social Security Act [10] established the Medicaid program, a cooperative federal-state partnership under which participating states provide federally-funded medical services to needy individuals.[11] Although participation in the program by a state is voluntary, once a state decides to participate, it must comply with federal statutory and regulatory requirements.[12] States electing to participate in the Medicaid program must fund a minimum of seven mandatory services.[13] States may elect to cover additional optional services and, once they do, those services become part of the state's Medicaid plan and are subject to the requirements of federal law.[14]

The State of Alaska has elected to participate in the federal Medicaid program.[15] The state provides all mandatory services as well as a number of optional services, including "adult dental services." [16] Authority to promulgate regulations and to administer the program is accorded to the Alaska Department of Health and Social Services.[17]

The regulations governing dental services provided to Medicaid-eligible adults are set out in 7 AAC 43.600 [18] and 7 AAC 43.620.[19] As the regulations clearly state, dental services for Medicaid recipients age twenty-one or older are limited to those "for the immediate relief of pain and acute infection." [20] Thus, there is no coverage for Medicaid-eligible adults desiring routine dental care.

### B. The Agency's Denial of Coverage for Mr. Garner's Routine Dental Care May Have Been Inconsistent with Its Own Regulations.

 In his appeal to the superior court, Garner argued that the state failed to follow its own regulations in denying his claim.[21]

---

9. *Chizmar v. Mackie*, 896 P.2d 196, 200 (Alaska 1995) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

10. 42 U.S.C. § 1396.

11. *Beal v. Doe*, 432 U.S. 438, 440, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977).

12. *State, Dep't of Health & Soc. Servs., Medicaid Rate Comm'n v. Hope Cottages, Inc.*, 863 P.2d 246, 248 (Alaska 1993).

13. 42 U.S.C. § 1396a(a)(10); 42 U.S.C. § 1396d(a).

14. 42 U.S.C. § 1396d(a); 42 C.F.R. § 440.240. *See also Meyers v. Reagan*, 776 F.2d 241, 243 (8th Cir.1985) (explaining that once a state decides to provide optional services, it must comply with the federal regulations that govern those services).

15. AS 47.07.010.

16. AS 47.07.030(a)-(b). Adult dental services under the Alaska Medicaid program are defined by statute as "minimum treatment for the immediate relief of pain and acute infection provided by a licensed dentist." AS 47.07.900(1).

17. AS 47.07.040.

18. In relevant part, 7 AAC 43.600 provides:

(a) Medicaid will pay for routine dental services for recipients under age 21. Medicaid payment for recipients age 21 or older is limited to dental services for the immediate relief of pain and acute infection.

19. 7 AAC 43.620 provides:

The division will not pay for the following dental services:
(1) dentures, relines, or denture repairs for recipients age 21 or older;
(2) treatment for conditions of the temporamandibular joint;
(3) final restorations in resin or amalgam for more than five surfaces;
(4) treatment for chronic dental disease, including gingivitis and periodontis, for recipients age 21 or older;
(5) indirect pulpcapping;
(6) endodontic services for recipients age 21 or older; and
(7) dental services that are not for the immediate relief of pain and acute infection for recipients age 21 or older.

20. 7 AAC 43.600(a).

21. Although Garner briefed this claim that the agency failed to follow its own regulations in his appeal to the superior court, and the state responded to it, the superior court did not decide the matter. Garner has not raised the issue in his appeal to this court, and we normally would not reach it for that reason. *Martinson v. Arco*

The state's Medicaid regulations contain a provision allowing the agency to make exceptions under the appropriate circumstances. Thus, 7 AAC 43.080(a) provides:

> The need for medical care is not subject to inflexible determination, which can be described completely in policy or regulations. Professional judgment must be exercised in each case and exceptions granted in those instances where unusual circumstances exist. Where undue hardship may result to an individual if medical care services are denied by strict application of regulations, exceptions to policy may be made when considered appropriate by the division.

In his decision, Hearing Officer James M. Leonard stated that "[n]one of the federal or state Medicaid regulations I reviewed, which pertained to covered and excluded Medicaid services, referenced exceptions for any individuals—even those who were severely disabled." When Garner pursued his administrative appeal, Bob Labbe, Director of the Division of Medical Assistance, concurred with the hearing officer's decision to deny Garner's request for routine dental care. At no time did Hearing Officer Leonard or Director Labbe mention section 43.080 of the regulations or inquire into its applicability.

In his brief to the superior court, Garner argued that if "the agency [had] taken the proper action and made a determination under this regulation it would necessarily have determined that routine dental care is a necessity for Mr. Garner." However, as Gar-

ner further noted, "contrary to its own regulations, it chose to strictly apply some of its regulations and to ignore others." In reply, the state contended that while "7 AAC 43.080 provides for exceptions based on unusual circumstances or undue hardship[,] . . . Mr. Garner's routine dental care does not qualify for this exception."

The state offered no support for its position, and we see none in the record. While there are numerous statements from Garner's doctors and caretakers indicating that Garner would suffer undue hardship should he be denied these otherwise routine dental services, the state has offered no evidence to the contrary and the agency has made no factual findings on which such a conclusion could be based. While the decision whether denial of Medicaid coverage for the dental care Garner received constitutes an undue hardship is committed to the discretion of the agency, we believe the agency abused that discretion by failing to even consider whether the exception applied. We have held it to be legal error for an agency to fail to apply exceptions found in its own regulations or, at the very least, to inquire into their applicability.[22] Because the agency failed to inquire into the applicability of subsection 43.080(a), we remand to the superior court with instructions to remand to the agency for further findings on whether the agency's denial of coverage for Garner's otherwise routine dental care would result in an undue hardship for him and, if so, whether the requested services should be covered under this exception.

*Alaska, Inc.,* 989 P.2d 733, 738 (Alaska 1999); *Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991). But there is an exception to this rule, for we have held that an appellant's failure to raise an issue in this court will not preclude our consideration of it where it involves a question of law critical to a proper and just decision of the case and where the parties have been given the opportunity to brief the matter. *Vest v. First Nat'l Bank of Fairbanks,* 659 P.2d 1233, 1234 n. 2 (Alaska 1983). *See also Hickel v. Halford,* 872 P.2d 171, 175 (Alaska 1994). Because we view this as a potentially determinative issue and because the parties have already briefed it before the superior court, we have decided to reach the issue of the agency's failure to follow its own regulations.

**22.** *See, e.g., Payton v. State,* 938 P.2d 1036, 1044 (Alaska 1997) (citing, as error, the failure of the Board of Fisheries to explain why a regulatory exception allowing residents to stop using certain methods of handling, preparing, preserving and storing salmon did not apply to Skwentna-area residents' decision to stop drying salmon). *Cf. Cano v. Municipality of Anchorage,* 627 P.2d 660, 664 (Alaska App.1981) (holding that the superior court's "outright refusal to consider the various alternatives available as a matter of discretion to the court is a failure to exercise any discretion at all").

## C. The Agency May Have Discriminated Against Garner in Violation of the ADA by Failing To Reasonably Accommodate Garner's Disability.

 Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." [23] The regulations issued by the Department of Justice to implement Title II provide in relevant part:

(b)(1) A public entity, in providing any aid, benefit, or service, may not ... on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

. . . .

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

. . . .

(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. [24]

 To prove that a public program or service violated Title II of the ADA, it is incumbent upon the individual alleging discrimination to show that:

(1) he is "a qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. [25]

Thus, where a service or benefit is defined in such a way as to deny an otherwise eligible disabled individual from gaining meaningful access to it, that individual has suffered discrimination as defined by the ADA. [26]

 In order to remedy the discrimination, the public entity may be required to provide the individual with a reasonable accommodation. [27] A disabled individual who has suffered discrimination under Title II bears the initial burden of demonstrating that a reasonable accommodation exists and that it would enable him to access the services or benefits he has been denied by virtue of his disability. [28] Once he has met this obligation, the burden shifts to the public entity to demonstrate that the requested accommodation is unreasonable. [29] The answer to this question will depend on a "fact-specific individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." [30] The process of ascertaining what constitutes a reasonable accommodation should be an interactive one, in which the public entity has an obligation to gather sufficient information from the disabled individual to determine what accommodations are necessary and feasible, rather than rejecting the request out of hand. [31]

23. 42 U.S.C. § 12132.

24. 28 C.F.R. § 35.130.

25. *Duvall v. County of Kitsap,* 260 F.3d 1124, 1135 (9th Cir.2001) (quoting *Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997)).

26. *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

27. 28 C.F.R. § 35.130(b)(7); *Choate,* 469 U.S. at 301, 105 S.Ct. 712.

28. *Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 816 (9th Cir.1999).

29. *Id.* at 817.

30. *Id.* at 818.

31. *Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002) (analyzing public entity's obligation to provide reasonable accommodation under analogous provisions of section 504 of the Rehabilitation Act). *Cf. Moody–Herrera v. State, Dep't of Natural Res.,* 967 P.2d 79, 88 (Alaska 1998) (adopting the reasonable accommodation analy-

This process is triggered upon notification of the individual's disability and his desire for accommodation.[32] Should the public entity offer the disabled individual an accommodation the individual believes will not be sufficient to accommodate his disability, the individual must demonstrate that the offered accommodation was not reasonable, and that the individual was therefore unable to participate in the service in question.[33]

Garner contends that by requiring Medicaid recipients to verbalize their pain in order to obtain dental services "for the immediate relief of pain and acute infection," the agency's regulations discriminate against disabled individuals, such as him, who are unable to express pain and therefore unable to access these services. Thus, he argues that because the agency has made it a requirement that the proposed recipient of the emergency dental care be able to verbally express his need for such care, and because he is unable to do so, he has been discriminated against by the agency on the basis of his disability. The agency responds by alleging that Garner is "asking for discriminatory treatment based on a disability." The agency claims that because the same medically necessary dental services are provided to disabled and nondisabled individuals, no discrimination in the provision of services has occurred. Finally, the agency contends that requiring it to provide Garner with routine dental services in order to determine whether he is experiencing severe pain or acute infection would necessitate a fundamental alteration of its program and, as such, is barred by the ADA.

The parties agree that appellant is a qualified individual with a disability and that the agency is an entity covered by Title II. Additionally, the agency concedes that Garner is unable to express pain verbally. Because these facts are undisputed, Garner has successfully made out a *prima facie* case of disability-based discrimination.[34] The only remaining questions, then, are whether relying on Garner's caretakers to determine when he is experiencing pain or acute infection constitutes a reasonable accommodation, or whether the agency should instead cover the dental examination and root planing procedure performed by his doctor.

The agency's position appears to be that it is offering Garner a reasonable accommodation by allowing his caregivers to express his pain for him. According to the agency, his "care providers may observe his demeanor, gestures, reactions to stimuli, and other physical manifestations to determine if he may have pain or an infection, and whether he requires medical or dental attention." Garner contests the reasonableness of this accommodation, citing the undisputed evidence in the record that it is often impossible for his family, doctors, and caretakers to determine when he is in pain.

The record evidence of Garner's inability to effectively communicate his status, and the inability of those around him to determine when he is in pain, is striking. For example, Garner's live-in caregiver, Vincent F. Goodsell, Jr., wrote that the complexities of performing a thorough dental exam and cleaning on someone in Garner's condition made it possible for Garner to afford such treatment "only every five years or so." Given the infrequency of these routine visits, Goodsell expressed concern because "I often would not be able to determine if he was having a

sis employed by federal courts, in cases brought under Title VII, which asks "whether reasonable accommodation was available, was provided, or would impose undue hardship on the employer").

32. *Vinson*, 288 F.3d at 1154.

33. *Duvall*, 260 F.3d at 1137.

34. *See* 42 U.S.C. § 12132 (prohibiting the denial of the benefits of a service or program offered by a public entity to a qualified individual because of that individual's disability). Garner's case resembles in some respects the situation in *Crowder v. Kitagawa*, in which Hawaii subjected all dogs,

including guide dogs of visually-impaired individuals, to 120–day quarantine. 81 F.3d 1480, 1481–82 (9th Cir.1996). As a result, disabled individuals requiring the aid of guide dogs were unable to enjoy meaningful access to state services and activities during that four-month period. *Id.* at 1482. The court held that appellants had made out a *prima facie* case of disability-based discrimination based on their inability to access state services because of the quarantine requirement and required the state to make efforts to reasonably accommodate them. *Id.* at 1485–86.

significant problem until perhaps he was in need of emergency care. In come cases, I may not even be able to determine that he is, in fact, in need of such care." Goodsell then described the following situation: "For instance, when John was 29 years old his dentist found that he had an abscessed tooth. This condition was a surprise to everyone and one can only speculate on how long he experienced the problem." Garner had been unable to communicate to anyone that he was experiencing that painful condition. On another occasion Garner fell in his bathroom and broke his arm, but several hours passed before anyone realized he was injured (when he was observed wincing trying to get up from a sofa). Because his family and caretakers are unable to know when he is in pain, Garner argues that in order to access the services provided to all Medicaid recipients, the agency must cover his otherwise routine dental services as a reasonable accommodation for the purpose of treating painful conditions that, unlike the non-disabled, he is unable to communicate either promptly or at all.

The question of which accommodation—the state's or Garner's—if either, is to be preferred under the ADA regulations requires factual findings. Accordingly, we remand to the superior court with instructions to remand to the agency for findings on this issue. As a preliminary matter, it is for the agency to decide whether a reasonable accommodation exists, and if so, what it is.

Finally, the agency argues that providing the accommodation requested by Garner would result in a fundamental alteration in the nature of the service provided. The state offers no support for this position, and therefore we decline to consider it at this time.[35] The state remains free to present this argument to the agency on remand.

## V. CONCLUSION

Because the record does not contain sufficient findings to permit us to determine whether the agency has violated its own regulations or the ADA by refusing to pay for Garner's dental examination and accompany-

ing root planing procedure, we REMAND to the superior court with instructions to remand to the agency for further factual development. Specifically, we instruct the agency to determine whether the denial of coverage will result in an "undue hardship" for Garner under 7 AAC 43.080(a). If it would, the agency must consider whether the requested services should be covered under this exception. Should the agency determine that denial of coverage would not result in undue hardship, the agency must then ascertain whether, under the ADA, the accommodations proposed by the agency or by Garner are reasonable and, if so, which is preferable, and, if not, whether an alternative reasonable accommodation exists and can be implemented.

---

35. *Braun v. Alaska Commercial Fishing & Agric. Bank,* 816 P.2d 140, 145 (Alaska 1991) (reason-

ing that issue which has been insufficiently briefed need not be addressed by this court).