**HIDDEN HEIGHTS ASSISTED LIVING, INC., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF HEALTH CARE SERVICES, Appellee.**

No. S–13029.

Supreme Court of Alaska.

Dec. 31, 2009.

John C. Pharr, Law Offices of John C. Pharr, Anchorage, for Appellant.

Jonathan P. Clement, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I.  INTRODUCTION

Medicaid provider Ernest Reeves, doing business as Hidden Heights Assisted Living, Inc. ("Hidden Heights" or "the facility"), appeals the finding that the facility received $47,686.79 in Medicaid overpayments. We conclude that Hidden Heights cannot invoke the doctrine of equitable estoppel to prevent the Department of Health and Social Services ("DHSS") from enforcing the applicable record-keeping and audit regulations. But because DHSS agreed to give Hidden Heights an evidentiary hearing, we conclude it was an abuse of discretion to exclude documentary evidence Hidden Heights offered to prove that it provided compensable services. We remand for consideration of this evidence.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Reeves owns and operates Hidden Heights, a residential facility for elderly male adults. Reeves and a few employees provide care to five residents. The facility is certified as a home and community-based waiver

provider; it has been enrolled as a Medicaid provider since 1999.[1]

Hidden Heights appeals the results of a ruling issued after DHSS conducted record and field audits of documentation supporting Hidden Heights's bills for services. Because an overview of federal and state Medicaid law is necessary to address Hidden Heights's appeal, we first discuss applicable federal and state law.

### 1. Medicaid audits and record-keeping requirements

The Medicaid program is "a cooperative federal-state partnership under which participating states provide federally-funded medical services to needy individuals."[2] A state's participation in the Medicaid program is voluntary, but "once a state decides to participate, it must comply with federal statutory and regulatory requirements."[3] Alaska participates in the Medicaid program, and DHSS promulgated regulations in 7 Alaska Administrative Code (AAC) 43 to implement and administer it.[4]

#### a. Applicable federal law

The federal Medicaid Act requires that states establish record-keeping requirements

for providers.[5] It also requires that states audit provider records to monitor the use of Medicaid funds.[6] States must establish Medicaid provider agreements under which a provider agrees to (1) "[k]eep any records necessary to disclose the extent of services the provider furnishes to recipients," and (2) provide this information, as well as "any information regarding payments claimed by the provider for furnishing services under the plan," to a Medicaid agency upon request.[7] Additionally, under 42 U.S.C. § 1396a(a)(42), "[a] State plan for medical assistance must ... provide that the records of any entity participating in the plan and providing services reimbursable on a cost-related basis will be audited as the Secretary determines to be necessary to insure that proper payments are made under the plan."[8]

One purpose of record audits is to identify improper payments,[9] such as overpayments.[10] Under 42 C.F.R. § 433.304, "[o]verpayment means the amount paid ... to a provider which is in excess of the amount that is allowable for services furnished under section 1902 of the Act and which is required to be refunded under section 1903 of the Act." When a state identifies an overpayment, it must seek recoupment.[11] And the state's

---

1. The home and community-based waiver program offers "a choice between home and community-based waiver services and institutional care in a nursing facility ... to aged, blind, physically or developmentally disabled, or mentally retarded individuals who meet [certain] eligibility criteria." 7 Alaska Administrative Code (AAC) 43.1000 (2008).

2. *Garner v. State, Dep't of Health & Soc. Servs., Div. of Med. Assistance*, 63 P.3d 264, 268 (Alaska 2003). "Title XIX of the Social Security Act established the Medicaid program." *Id.;* 42 U.S.C. § 1396 (2006).

3. *Garner*, 63 P.3d at 268; *see also* AS 47.05.010 (listing DHSS's duties).

4. *See Garner*, 63 P.3d at 268 (citing AS 47.07.040); 7 AAC 43.005–.1990 (2008).

5. *See* 42 U.S.C. § 1396a(a)(27).

6. *See id.* § 1396a(a)(42) (requiring states to conduct audits to "insure that proper payments are made under the plan").

7. 42 C.F.R. § 431.107(b) (2008); *see also* 42 U.S.C. § 1396a(a)(27) (providing the same).

8. 42 U.S.C. § 1396a(a)(42); *see also* 42 C.F.R. § 447.202 ("The Medicaid agency must assure appropriate audit of records if payment is based on costs of services or on a fee plus cost of materials.").

9. *See* 42 U.S.C. § 1396a(a)(42).

10. *See* 42 C.F.R. § 433.304 (defining overpayment).

11. 42 C.F.R. § 433.316(b) ("Unless [the state] chooses to initiate a formal recoupment action against a provider without first giving written notification of its intent, [the state] must notify the provider in writing of any overpayment it discovers ... and must take reasonable actions to attempt to recover the overpayment."); *cf. id.* § 433.312 (requiring state governments to refund, to the federal government, the "Federal share" of any overpayments within sixty days of their discovery). Agencies must report identified overpayments to the federal government quarterly. *See id.* § 433.320(a).

Federal law also requires each state to establish a Medicaid "fraud and abuse control unit" "for the collection, or referral for collection to a

share of federal Medicaid funds is "reduced ... to the extent of any overpayment." [12]

### b. Applicable Alaska law

Under Alaska's Medicaid program, providers like Hidden Heights may seek payment for "medical services rendered to Medicaid recipients," [13] but not for room and board.[14] Providers in Alaska are not required to submit supporting documentation at the time payment is requested, but they are required to maintain records of the services they provide [15] and to submit to record audits.[16] 7 AAC 43.065 requires that providers "comply with applicable state and federal Medicaid law" and "cooperate in reports, surveys, reviews, or audits conducted by the department." [17] 7 AAC 43.065 also states:

The provider shall retain records necessary to disclose fully to the division the extent of services provided to recipients. Information regarding any payment must be made available, upon request, to division and federal personnel.[18]

Since 1997, 7 AAC 43.030 has required that Medicaid providers maintain records to support requests for payment.[19] It states:

A provider shall maintain accurate financial, clinical, and other records necessary to support the care and services for which payment is requested. The provider is responsible to assure that the provider's designated billing service, or other entity responsible for the maintenance of financial, clinical, and other records, meets the requirements of this section.[20]

The regulation also defines what provider records must contain: they must "identify patient information including (1) recipient receiving treatment; (2) specific services provided; (3) extent of each service provided; (4) date on which each service is provided; and (5) individual who provided each service." [21]

Alaska's Medicaid regulations have provided for post-payment audits of provider records since 1997.[22] Former 7 AAC 43.067, which was in effect when Hidden Heights submitted the billing records at issue, stated, in relevant part, that DHSS "may conduct a

---

single State agency, of overpayments that are made under the State plan ... to health care facilities and that are discovered by [the Medicaid fraud and abuse control unit] in carrying out its activities." 42 U.S.C. §§ 1396a(a)(61), 1396b(q)(5).

**12.** *Id.* § 1396b(d)(2)(A).

**13.** 7 AAC 43.005(a) & (b)(35) (2008); *see also* 7 AAC 43.035(a)(18) (listing home and community-based service providers as types of providers "eligible to enroll with the department and bill directly for services rendered").

**14.** 7 AAC 43.1044(c)(2)(A).

**15.** *See* 7 AAC 43.065(c) (2001); 7 AAC 43.030 (2008). We cite the version of 7 AAC 43.065 in effect when DHSS began auditing Hidden Heights in 2004, not the current version, which was amended in 2007. (Applying the 2007 version would not change the result, as subsection (c) was not affected by the amendment. *Compare* 7 AAC 43.065 (2001), *with* 7 AAC 43.065 (2007).)

**16.** AS 47.05.200(d); *see also* former 7 AAC 43.067 (1998) (providing for audits at DHSS's discretion) (repealed in 2006 and replaced by regulations implementing AS 47.05.200's new mandatory audits); 7 AAC 43.065(b)(3) (requiring providers to cooperate with audits); *cf.* 7 AAC 43.032(a) (requiring providers to produce

records to state officials on request, implicitly for auditing purposes).

**17.** 7 AAC 43.065(b)(2)-(3).
The entirety of 7 AAC 43.065(b) (2001) follows: Providing medical or medically-related services to recipients or billing the division for those services constitutes agreement by the provider
(1) to follow procedures that are consistent with guidance in the applicable *Alaska Medicaid Provider Billing Manual* as of July 14, 2000;
(2) to comply with applicable state and federal Medicaid law; and
(3) to cooperate in reports, surveys, reviews, or audits conducted by the department.

**18.** 7 AAC 43.065(c).

**19.** *See* 7 AAC 43.030(a) (2008) (am.1997, eff. 1997).

**20.** *Id.*

**21.** 7 AAC 43.030(b)(1)-(5).

**22.** *See* former 7 AAC 43.067 (eff.1997) (repealed 2006) (providing for discretionary audits); 7 AAC 43.1440 (eff.2006) (providing for mandatory audits).

desk review, field audit, or audit of a provider to determine the provider's compliance with the requirements of 7 AAC 43.030 and with other requirements of this chapter."[23] 7 AAC 43.032(d) authorized DHSS to identify overpayments on the basis of a provider's failure to provide documentation in an audit and to seek recoupment for such overpayments.[24]

The Alaska Legislature made post-payment audits mandatory in 2003, when it passed AS 47.05.200.[25] Under subsection (a) of that statute, DHSS must "annually contract for independent audits of a statewide sample of all medical assistance providers in order to identify overpayments and violations of criminal statutes."[26] Under the 2003 law, compliance with audits is a condition of receiving payment for medical services. Alaska Statute 47.05.200(d) states, in pertinent part: .

> As a condition of obtaining payment under AS 47.07 and AS 47.08 . . . a provider shall allow (1) the department reasonable access to the records of medical assistance recipients and providers; and (2) audit and inspection of the records by state and federal agencies.

7 AAC 43.081(a) defines an "overpayment" as, among other things, a reimbursement "in excess of the amount due because of the billing practices of the provider."[27] Alaska

Statute 47.05.200(b) addresses recoupment of overpayments. It requires that DHSS use "administrative procedures to recoup overpayments identified in the audits."[28] Alaska's Medicaid regulations require that providers "must refund to the division any reimbursed claim that the division finds, after a post-payment review, does not meet the requirements of this chapter."[29]

Alaska's regulations provide for appeals from record audits. The regulation in effect when DHSS audited Hidden Heights, 7 AAC 43.085(i), stated:

> The appeal must be submitted to the commissioner within 30 days after the provider receives the results and must include
>
> (1) a clear description of the issue or decision being appealed;
>
> (2) the reason for the appeal; and
>
> (3) all information and materials that the provider requests the commissioner to consider in resolving the appeal.[30]

### 2. The Hidden Heights audit

In 2004 DHSS hired Myers and Stauffer, a certified public accounting firm ("the auditor"), to conduct independent audits of Medicaid providers under AS 47.05.200(a) and former 7 AAC 43.067. The auditor conducted a desk review audit of fifty-three of the seventy-four Medicaid claims that Hidden

23. Former 7 AAC 43.067(a) (1998). 7 AAC 43.067 was amended in June 2004 and repealed in December 2006. *See* former 7 AAC 43.067 (am.2004) (repealed 2006). The regulation was replaced by 7 AAC 43.1440, which made annual audits mandatory. *See* 7 AAC 43.1440 (eff.2006). Because DHSS began auditing Hidden Heights in March 2004, before the June 2004 amendments or the December 2006 repeal, the 1998 version of 7 AAC 43.067 applies.

Under former 7 AAC 43.067, a "desk review" was an audit "of a provider's records without a visit to the provider's place of business or site at which the provider maintains business records," and a "field audit" was an audit "of a provider's records at the provider's place of business or site at which the provider maintains business records." Former 7 AAC 43.067(e)(2)-(3).

24. 7 AAC 43.032(d) (eff.1997).

25. *See* ch. 66, § 3, SLA 2003.

26. AS 47.05.200(a). DHSS may use "standard statistical sampling methods to select claims for

review or audit and to calculate overpayments to providers." Former 7 AAC 43.068 (1998); *see also* 7 AAC 43.1470 (2008) (eff.2006) (providing the same).

27. 7 AAC 43.081(a)(13) (1998). We cite the 1998 version of 7 AAC 43.081 because the regulation was amended in 2006, after DHSS audited Hidden Heights. Applying the current version would not change the result, as the 2006 amendment did not change the definition of "overpayment." *Compare* 7 AAC 43.081 (1998), *with* 7 AAC 43.081 (2008).

28. AS 47.05.200(b); *see also* 7 AAC 43.065(h)(2001) ("Providing medical or medically-related services to recipients or billing the division for those services constitutes an agreement by the provider that the division may take action under 7 AAC 43.081 to recover an overpayment.").

29. 7 AAC 43.065(g).

30. Former 7 AAC 43.085(i)(1)-(3) (2004).

Heights submitted for payment between April 1, 2002 and March 31, 2003.[31] Because the auditor deemed the first set of documents Hidden Heights submitted insufficient, it made additional document requests, with which Hidden Heights complied.

On June 24, 2004, the auditor notified Hidden Heights that it would be the subject of an on-site field audit and requested more documents. Tracy Allan Hansen, who conducted the audits and testified as an expert on Medicaid audits in the evidentiary hearing, testified that Hidden Heights was selected for an on-site field audit because "the desk review had left . . . a number of concerns relating to the . . . quality and . . . breadth of documentation. . . ." He testified that Hidden Heights had not submitted "documentation for every day that was being covered in the claims in the sample."

Hansen and a registered nurse conducted the on-site audit at Hidden Heights's office, which is located in Reeves's home, some miles away from the facility. Hansen testified that Hidden Heights provided its documents in a "highly disorganized manner that did not include, for example, filing by patient name, . . . filing in . . . chronological order and in . . . many cases documents were vague as to what specific date they might apply to."[32] Hansen testified that he was informed that Hidden Heights had presented him with all of the documents available for the audited time period.

The auditor sent Hidden Heights a notice of preliminary findings, explaining the audit revealed no documentation to support twenty-seven of the fifty-three claims reviewed and giving the facility twenty-one days to send additional documents. Hidden Heights provided no additional documentation. Based on the preliminary findings of twenty-seven overpayments, the auditor's initial report found the total extrapolated overpayments for the period between April 1, 2002 and March 31, 2003 amounted to $104,900.83.

The auditor also found that documents for recording whether compensable services had been performed "were often completed by the caregiver initialing once and drawing a line through all of the boxes on the form, rather than initialing each daily [service] individually," but the auditor made no overpayment findings on this basis. The report expressed disapproval of the facility's failure to update financial information (such as patient accounts receivables). But Hansen testified that overpayment findings were not based on the adequacy of financial records. Overpayments were found only where Hidden Heights submitted no documentation for the day or where the only documentation it submitted failed to show who provided the services in question.

DHSS gave Hidden Heights the opportunity to appeal the audit results under former 7 AAC 43.085(i), which Hidden Heights did in March 2005, submitting additional documentation. The new documentation consisted of documents showing compensable daily services ("service records"). The service records list nutrition, dressing, bathing, hygiene, toileting, skin care, grooming, administration of medication, laundry, and chores in a vertical column on the left. A horizontal column across the top of the page lists the days of the month. A staff member's initials or a defined symbol appeared under each date, with a handwritten, vertical line seeming to indicate that all compensable services were performed for that day.[33] Some of the service records had undefined stars drawn next to various activities rather than the specific

---

31. The total Medicaid payments Hidden Heights received for the seventy-four claims it submitted in this time period amounted to $284,344.41. The fifty-three claims reviewed in the audit amounted to a total of $202,754.64.

32. He further testified: "The best way that I could characterize the way the documentation was presented to us is that it was piled in stacks on . . . a table and that these stacks were highly disorganized." Reeves and his accountant, Sherry Mettler, testified the documents were dis-

organized and in stacks and boxes in part because Reeves was in the process of moving Hidden Heights's office from Reeves's mother's house to his house.

33. We use "defined symbol" to refer to a symbol that is explained in a key on the document. For example, some of the "defined symbols" are identified in a key as "[symbol] = [initials of a particular provider]."

initials of the care provider.[34] Hidden Heights also provided medication supervision records showing each patient's medications and the dates on which a staff member administered medication.

The auditor accepted the supplemental records that documented the services provided by a line drawn down the column of activities. But the auditor did not reduce overpayment findings based on newly produced records that: (1) failed to identify who provided the services, or (2) only identified that medication was administered without indicating that any other reimbursable services were provided.[35] In April 2005 the auditor revised the overpayment findings to total $45,093.57 for the sample time period, extrapolated to $62,960.83 for the entire audited time period. The facility appealed this finding in June 2005 and submitted still more documents. Hidden Heights's second appeal resulted in a reduced overpayment finding of $39,111.02 for the sample time period, extrapolated to $54,607.84 for the entire audited time period.

After Hidden Heights's second appeal, the commissioner of DHSS sent Hidden Heights a compromise settlement offer. The commissioner offered to accept a reduced payment in satisfaction of the auditor's overpayment finding. Alternatively, if Hidden Heights rejected the compromise monetary settlement, the commissioner gave Hidden Heights the option of requesting an "evidentiary hearing" or pursuing an appeal in the superior court.

Hidden Heights requested an evidentiary hearing and simultaneously filed a notice of administrative appeal in the superior court. The superior court stayed the appeal pending the outcome of the evidentiary hearing.

## B. Proceedings

### 1. Pre-hearing events, the evidentiary hearing, and the agency decision

In pre-hearing memoranda, Hidden Heights argued that DHSS should be equitably estopped from enforcing 7 AAC 43.030 because DHSS did not require providers to keep records of specific reimbursable services before 2004.[36] Hidden Heights also argued that it could prove that residents were physically present at the facility on the dates of the overpayments and impliedly argued that proof of the residents' physical presence should be accepted as proof that the residents received reimbursable services on those dates. Hidden Heights offered "Exhibit D," a set of daily activity logs, to support this argument.

In a pre-hearing ruling, the hearing examiner described the documents she would consider at the evidentiary hearing:

I will only consider documents Hidden Heights presented to the Department's auditing team prior to my assignment to this case. Therefore, the Department will have had an opportunity to receive, disseminate, and consider the evidence long before the hearing date. This restriction will ensure I remain part of the appellate process and not become an independent auditor.

The parties did not agree about which documents were made available to the auditor. The hearing officer decided that she would rule on the admissibility of Exhibit D at the hearing, where she could assess the credibility of the witnesses.

The evidentiary hearing was held from March 28 to March 30, 2006. Hansen testified that Hidden Heights's documents were inconsistent but that he did not make over-

---

**34.** We use "undefined star" to mean a star in a document with no key to explain the star's meaning.

**35.** Mary Francis Arseneau, testifying as an Alaska Medicaid expert, explained that Medicaid pays assisted-living providers an all-inclusive per-diem rate but does not pay for individual services. She testified that this is why a record showing that only one service was provided on a given day, such as the administration of medication, may result in an overpayment finding for that day.

**36.** To invoke equitable estoppel against the government a party must show: "(1) the division asserted a position by conduct or words; (2) [the party] acted in reasonable reliance on the division's assertion; (3) [the party] suffered resulting prejudice; and (4) estopping the division from acting against [the party's interest] serves the interest of justice so as to limit public injury." *State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell*, 8 P.3d 351, 356 (Alaska 2000).

payment findings if some identifiable mark, such as initials or a defined symbol, indicated a staff person provided all or most of the necessary, reimbursable services. He testified that he applied a standard of "leniency in the extreme" to Hidden Heights's documents, finding overpayments only where there was "absolutely no documentation" or documentation for only one service, such as the administration of medication.

Reeves testified that DHSS had not enforced any record-keeping requirements on Hidden Heights before 2004. But he also admitted that he had agreed Hidden Heights would comply with 7 AAC 43.030's record-keeping requirements when he applied for certification as a Medicaid provider, and that by enrolling as a Medicaid provider he agreed "to keep records necessary to fully disclose the extent of the services provided to recipients under the Medicaid program."

Reeves testified that his facility performed reimbursable services on the dates for which there was no documentation. He testified Hidden Heights did not bill for any days on which it had not provided reimbursable services. Hidden Heights sought to admit Exhibit D, daily activity logs, to show that residents were present at the facility on the days for which Hidden Heights billed. After hearing testimony that the auditor had never seen Exhibit D, the hearing examiner refused to admit the logs because she believed the purpose of the hearing was appellate review of the audits and audit appeals and she believed she could only consider documentary evidence given to the auditor. But the hearing examiner allowed Reeves to testify on the content of each daily activity log and to read each log into the record.

The facility also offered Exhibit E, a service record with a row of green stars. The green stars are defined on the document as equating to the initials of a particular care provider. Exhibit E also has a row of black stars. The black stars are undefined. Reeves testified that he knew which employee used stars instead of initials to demonstrate services performed. He explained a particular employee "used a green felt tip marker" to draw some of the stars and to write a key defining them. He testified that

the green ink did not show up on the photocopied document Hidden Heights gave the auditor. Other stars appear to have been written in ball-point pen. The stars written in ball-point pen are visible on the photocopied records, but they do not have a corresponding key identifying the maker of the stars. The hearing examiner permitted Reeves's testimony and admitted the original document with the green stars into evidence as "Exhibit E." Reeves did not offer the testimony of the employee who used stars instead of initials.

The only witness that Reeves presented or attempted to present was Sherry Mettler, his accountant. Mettler testified that assisted living facilities were confused as to what documentation DHSS wanted them to maintain. She also testified she was at Reeves's office during the on-site audit and that neither she nor Reeves understood what kind of documentation the auditors wanted.

The hearing examiner issued a revised proposed decision in August 2006, which the commissioner of DHSS adopted. The examiner concluded that Hidden Heights could not establish three of the four elements of equitable estoppel. Interpreting the hearing as an appeal of the audit, she implicitly accepted DHSS's decision to find overpayments where the documentation that Hidden Heights gave to the auditor inadequately documented the services provided. In response to Hidden Heights's challenge to the use of 7 AAC 43.030(b) as the standard for determining the adequacy of documentation, the hearing examiner found the regulation's requirements "clear" and ruled that Hidden Heights "failed to document the services it billed the Department for." The examiner emphasized "[t]here were very few dates the auditors did not accept as valid," specifically, only those "in which the [service records] did not indicate services were provided," or those for which the only documents submitted were medication logs showing only one reimbursable service was provided.

The hearing examiner explained that admitting Exhibit D would not have changed her decision because Exhibit D only documented whether a resident was present at the facility on a given day, not whether the

patient received reimbursable services on that day. The hearing examiner stated: "Hidden Heights wishes this hearing examiner to assume that if a patient is at the facility, he is receiving services. Payment of claims cannot be made on assumptions." She further wrote: "It would be unconscionable for the Department to pay for services under the assumption that if a person is present in a facility, then that facility must be providing all the services required."

The hearing examiner also addressed the service record documented with green stars, Exhibit E. Although she initially admitted Exhibit E into evidence, the hearing examiner reversed herself in her final decision, reasoning "since the auditors did not have an opportunity to review this during the audit process, the evidence was not admitted." She then found that because the photocopy of the document that the auditor reviewed did not have a key defining the green stars, and because without an explanation for the green or black stars, the document neither showed that reimbursable services were provided nor identified who provided them, the document was insufficient to refute DHSS's overpayment findings.

Finally, the examiner concluded DHSS "is correct in recouping" the amount Hidden Heights received for services not supported by documentation and for non-reimbursable services, such as room and board.

### 2. The superior court appeal and decision

Hidden Heights appealed the agency's decision to the superior court. Hidden Heights challenged the denial of its equitable estoppel argument and raised the same arguments it made in the evidentiary hearing. It also argued that Exhibit D should have been admitted and that the hearing examiner erred with respect to the document with green stars, Exhibit E. Additionally, Hidden Heights argued that post-payment audits violate due process.

The superior court rejected Hidden Heights's equitable estoppel claim, concluded the hearing examiner should have admitted Exhibit D but agreed that admitting this exhibit would not have changed the outcome, and found that substantial evidence supported DHSS's overpayment findings.[37]

Hidden Heights appeals.

## III. STANDARD OF REVIEW

"In an administrative appeal where the superior court acts as an intermediate appellate court, we directly review the agency action in question."[38] In reviewing agency decisions, we review factual issues under the "substantial evidence" standard.[39] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"[40] based on the record as a whole.[41] We apply the "deferential 'reasonable basis' test" to legal issues involving "agency expertise or fundamental policy formation,"[42] including questions of "[w]hether the agency correctly interpreted its own regulations."[43] Under this standard, we defer to the agency unless the "interpretation is 'plainly erroneous and inconsistent

---

37. The court also rejected Hidden Heights's due process challenge as inadequately briefed.

38. *Garner v. State, Dep't of Health & Soc. Servs., Div. of Med. Assistance*, 63 P.3d 264, 267 (Alaska 2003) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 53 P.3d 578, 583 (Alaska 2002)) (internal quotation marks omitted).

39. *Bauder v. Alaska Airlines, Inc.*, 52 P.3d 166, 174 (Alaska 2002) (quoting *Peninsula Corr. Health Care v. Dep't of Corr.*, 924 P.2d 425, 426 (Alaska 1996)).

40. *Id.* (quoting *Thompson v. United Parcel Serv.*, 975 P.2d 684, 688 (Alaska 1999)) (internal quotation marks omitted).

41. *Municipality of Anchorage, Police & Fire Ret. Bd. v. Coffey*, 893 P.2d 722, 726 (Alaska 1995).

42. *Bauder*, 52 P.3d at 174 (quoting *Thompson*, 975 P.2d at 688) (internal quotation marks omitted).

43. *Garner*, 63 P.3d at 267 (citing *Cleaver v. State, Commercial Fisheries Entry Comm'n*, 48 P.3d 464, 467 (Alaska 2002)); *see also May v. State, Commercial Fisheries Entry Comm'n*, 175 P.3d 1211, 1215–16 (Alaska 2007).

with the regulation.' "[44] We use the "substitution of judgment" standard when reviewing "legal determinations not involving agency expertise."[45]

## IV. DISCUSSION

### A. DHSS Is Not Equitably Estopped from Enforcing Medicaid Record-keeping Requirements.

██ Hidden Heights argues that the hearing examiner should have equitably estopped DHSS from enforcing 7 AAC 43.030(b)'s record-keeping requirements. It reasons DHSS "never notified Medicaid providers" it would require compliance with the regulation and did not enforce the regulation until the legislature passed AS 47.05.200 in 2003. Whether equitable estoppel applies is a legal question not involving agency expertise, so we review it with our independent judgment.[46]

██ A party invoking equitable estoppel against the government must show four elements: "(1) the division asserted a position by conduct or words; (2) [the party] acted in reasonable reliance on the division's assertion; (3) [the party] suffered resulting prejudice; and (4) estopping the division from acting against [the party's interests] serves the interest of justice so as to limit public injury."[47] If we determine that the party cannot meet the first element, our analysis ends.[48]

[9] The hearing examiner rejected Hidden Heights's argument that DHSS asserted a position that it would not enforce 7 AAC 43.030(b) or require "strict" compliance with it. She found that 7 AAC 43.030 has long required providers to maintain records and "explicitly states what the provider's records must include." The hearing examiner seems to have concluded that Hidden Heights was on notice of these requirements from the time Reeves signed the Medicaid enrollment form in 1999 "stating he would abide by this regulation." We agree.

7 AAC 43.030's record-keeping requirements have been in effect since 1997.[49] The regulation contains a straight-forward list of the specific information the records must include.[50] Reeves knew he had to keep such documentation; he testified that in obtaining his provider license he agreed to "keep medical records necessary to disclose the extent of the services provided." Since 1997, regulations have authorized DHSS to audit providers like Hidden Heights for compliance with 7 AAC 43.030's record-keeping requirements and to seek recoupment of overpayments based on the results of such audits.[51] The enrollment form Reeves signed included agreements to comply with "review and audit regulations" and regulations "relating to recoupment/recovery of overpayment."

Reeves knew or should have known about the record-keeping requirements of 7 AAC 43.030(b), that Hidden Heights was subject to auditing by DHSS, and that DHSS had authority to recoup overpayments the audits revealed. The state's failure to inform Hidden Heights separately that the record-keep-

---

**44.** *May,* 175 P.3d at 1216 (quoting *Simpson v. State, Commercial Fisheries Entry Comm'n,* 101 P.3d 605, 609 (Alaska 2004)) (internal quotation marks omitted). We have explained the "reasonable basis" standard another way, stating that under that standard we "defer[ ] to the agency decision as long as it is reasonable and supported by the evidence." *Bauder,* 52 P.3d at 174 (citing *Thompson,* 975 P.2d at 688).

**45.** *Bauder,* 52 P.3d at 174 (quoting *Thompson,* 975 P.2d at 688) (internal quotation marks omitted).

**46.** *See State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell,* 8 P.3d 351, 355 (Alaska 2000).

**47.** *Id.* at 356 (citing *Wassink v. Hawkins,* 763 P.2d 971, 975 (Alaska 1988)).

**48.** *See id.* at 358 ("Because the first element necessary for equitable estoppel is absent, we need not consider the other three elements.").

**49.** *See* 7 AAC 43.030 (am.1997).

**50.** *See* 7 AAC 43.030(b).

**51.** *See* former 7 AAC 43.067 (eff.1997) (repealed 2006) (authorizing DHSS to audit providers for compliance with 7 AAC 43.030); 7 AAC 43.032(d) (2008) (eff.1997) (authorizing DHSS to find overpayments based on a provider's failure to provide adequate records during an audit and to seek recoupment of such overpayments). 7 AAC 43.032(d) has never been amended and remains valid today.

ing regulations might one day be enforced does not constitute the assertion of a position that the regulations would never be enforced.[52] Because Hidden Heights failed to show that DHSS asserted a position contrary to enforcement of 7 AAC 43.030(b) or recoupment proceedings, its equitable estoppel argument fails.

### B. 7 AAC 43.030(b)'s Record-keeping Requirements Are Clear and DHSS's Interpretation of the Regulation Had a Reasonable Basis.

■ Hidden Heights argues that 7 AAC 43.030(b) is ambiguous. We disagree. 7 AAC 43.030(b) requires that provider records identify: "(1) recipient receiving treatment; (2) specific services provided; (3) extent of each service provided; (4) date on which each service is provided; and (5) individual who provided the service."[53] This clear regulation provided a reasonable basis for DHSS to interpret 7 AAC 43.030(b) as requiring that Hidden Heights's documents record the services provided and who provided them.

### C. Because DHSS Offered Hidden Heights an Evidentiary Hearing, It Was an Abuse of Discretion To Consider Only the Documentary Evidence Given to the Auditor.

Hidden Heights challenges two evidentiary decisions made by the hearing examiner: one regarding Exhibit D, the daily logs in which Hidden Heights's staff noted the residents' activity levels, and another regarding the service record on which an employee used green stars instead of initials to document that reimbursable services had been provided, Exhibit E. The hearing examiner refused to admit Exhibit D into evidence because she believed her role was limited to appellate review and because Hidden Heights had not presented the daily logs to the auditor. The examiner did admit Exhibit E into evidence, but she later reversed this ruling, deciding

that Exhibit E was not admissible for the same reason as Exhibit D.

■ Hidden Heights argues that the hearing examiner abused her discretion by excluding both Exhibits D and E. It also argues that the hearing examiner erred by concluding that consideration of Exhibit D would not have changed the result. We review the hearing examiner's decision to exclude evidence for abuse of discretion.[54]

■ Former 7 AAC 43.085(i) allowed Hidden Heights to appeal the auditor's findings, but neither that regulation nor any other applicable Medicaid regulation entitled Hidden Heights to an evidentiary hearing at the administrative level.[55] Hidden Heights received an evidentiary hearing because the commissioner of DHSS offered it as part of a compromise. DHSS had never held such an evidentiary hearing for a Medicaid provider before. This explains why the hearing examiner understood her purpose at the hearing was to provide appellate review of the audit and the two audit appeals that Hidden Heights had already received. It also explains why the hearing examiner thought she could not admit documentary evidence Hidden Heights had not given the auditor during the audit or audit appeals. The hearing examiner's confusion is understandable because there are no statutes or regulations providing an evidentiary hearing for Medicaid billers challenging audit results. But because the commissioner of DHSS agreed to give Hidden Heights an evidentiary hearing, it was an abuse of discretion to limit the documentary evidence Hidden Heights could present to the documents it gave the auditor in the audit or audit appeals process.

The only evidence Hidden Heights offered that was not admitted was Exhibit D, patient activity logs, and Exhibit E, a single service record. But the hearing officer allowed Reeves to read Exhibit D into the record, she

---

**52.** *Cf. State, Dep't of Commerce & Econ. Dev.,* 8 P.3d at 356–57.

**53.** 7 AAC 43.030(b).

**54.** *Cf. Lopez v. Adm'r, Pub. Employees' Ret. Sys.,* 20 P.3d 568, 571 (Alaska 2001) (reviewing "exclusion of evidence by administrative boards for abuse of discretion").

**55.** Former 7 AAC 43.085(i) (2004); *see also* 7 AAC 43.005 *et seq.* (2008).

heard testimony interpreting Exhibit E, and she heard Mettler's testimony.[56]

■ Based on Reeves's testimony, the hearing examiner found that Exhibit D failed to show reimbursable services were provided; the logs only show that a resident was present at the facility on a given day and the resident's activity level. For example, one activity log shows that a resident rested all day; another shows that a resident smoked a lot of cigarettes on a particular day. Medicaid does not reimburse for room and board[57] and as the hearing examiner concluded, a log showing only that a resident was present does not support a finding that reimbursable services were provided. Because the hearing examiner permitted Reeves to read the contents of Exhibit D into the record, and because substantial evidence supports her finding that Exhibit D did not document the provision of compensable services, we conclude the failure to admit Exhibit D was harmless error.

We reach a different result with respect to Exhibit E, the document with green stars instead of an employee's initials.[58] Reeves testified that an employee "used a green felt tip marker" to draw stars instead of her initials and to write a key defining the stars.

According to Reeves, the green ink did not show up on the photocopy Reeves made for the auditor, and Reeves did not show the auditor the original document. The hearing examiner initially admitted Exhibit E but reversed herself in her final decision. It is unclear whether she considered Reeves's testimony explaining Exhibit E.

■ We conclude the exclusion of Exhibit E requires remand because we cannot say that the hearing examiner's decision would have been the same if she had considered Exhibit E or Reeves's testimony interpreting it. On remand, the hearing examiner must consider Exhibit E and the credibility of Reeves's testimony interpreting the meaning of the green stars and key.[59]

■ In reaching this conclusion, we do not imply that the statutory and regulatory scheme at issue entitles Medicaid providers in Hidden Heights's position to evidentiary hearings. That question is not before us. Here, DHSS agreed to give an evidentiary hearing to Hidden Heights, so it was required to consider Hidden Heights's evidence. If on remand any overpayment findings are refuted, the total amount of overpayments must be reduced accordingly.[60]

---

**56.** DHSS argues that "in a Medicaid provider audit, documentation is the only evidence [a provider can offer] of medical assistance actually provided." We need not reach that issue. Because DHSS agreed to provide Hidden Heights an evidentiary hearing, the evidence Hidden Heights offered, Exhibits D and E and the testimony of two witnesses, should have been admitted and considered by the hearing officer.

**57.** *See* 7 AAC 43.1044(c)(2)(A).

**58.** Exhibit E is the single service record with green stars. The record contains similar but photocopied service records for the same month with black stars apparently written in ball-point pen. These black stars do not have a key explaining who made them. It is unclear from the testimony and record whether Reeves offered Exhibit E to serve as a key for all the undefined stars for that month or whether Exhibit E was only intended to serve as documentation for one day.

**59.** If Hidden Heights offered Exhibit E as a key to interpret the stars written in ball-point pen on other service records disallowed by the auditor,

those service records should also be considered on remand.

**60.** Hidden Heights also argued that DHSS is not required to seek recoupment of overpayments and that DHSS could seek sanctions instead. We disagree. If DHSS's overpayment findings are adequately supported, the applicable statutes and regulations require DHSS to seek recoupment. *See* AS 47.05.200(b) ("Within 90 days after receiving each audit report from an audit conducted under this section, the department shall begin administrative procedures to recoup overpayments identified in the audits."); 42 C.F.R. § 433.316(b).

Finally, to the extent Hidden Heights raises a due process challenge on appeal, we consider it waived for inadequate briefing and failure to raise the issue in the statement of points on appeal. *See A.H. v. W.P.*, 896 P.2d 240, 243 (Alaska 1995) ("[W]here a point is given only cursory statement in the argument portion of a brief, the point will not be considered on appeal." (quoting *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991))); *Wren v. State*, 577 P.2d 235, 237 n. 2 (Alaska 1978) (stating we will not address issues not listed in the statement of points on appeal or not adequately briefed).

## V. CONCLUSION

We AFFIRM the hearing examiner's conclusion that DHSS was not equitably estopped from enforcing Medicaid record-keeping regulations and from auditing Hidden Heights. We AFFIRM the hearing examiner's conclusion that 7 AAC 43.030(b)'s record-keeping requirements are not ambiguous. The failure to admit Exhibit D was harmless error, but we REVERSE the hearing officer's decision with respect to the admissibility of Exhibit E and consideration of Reeves's testimony regarding that exhibit. We REMAND for proceedings consistent with this opinion.